## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Rafael A. Vanderpool

**25 CV 6905**

_____

Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been assigned)

-against-

Do you want a jury trial?

City of New York

☒ Yes    ☐ No

Write the full name of each defendant. The names listed above must be identical to those contained in Section I.

## EMPLOYMENT DISCRIMINATION COMPLAINT

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

---

2025 AUG 20 PM 10:34

SDNY PRO SE OFFICE

Rev. 3/24/17

## I.    PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Rafael | A | Vanderpool |
|---|---|---|
| First Name | Middle Initial | Last Name |

330 Birch Drive

Street Address

| Roselle, Union County | NJ | 07203 |
|---|---|---|
| County, City | State | Zip Code |

| | r.vanderpool@gmail.com |
|---|---|
| Telephone Number | Email Address (if available) |

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:    **City of New York**

Name

NYC Law Department, Attn: Service Unit, 100

Address where defendant may be served

| New York | NY | 10007 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:

Name

Address where defendant may be served

| | | |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

_____

Name

_____

Address where defendant may be served

_____

County, City                State                Zip Code

## II.    PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

**375 Pearl St., 19th Floor**

Name

**New York City Department of Sanitation – Information Technology**

Address

**New york**                         **NY**                **10038**

County, City                State                Zip Code

## III.    CAUSE OF ACTION

### A.  Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☒  **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☒  race:           **Latino**

☒  color:          **Black**

☐  religion:       _____

☐  sex:            _____

☒  national origin:  **Dominican Republic**

☐ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

My race is: _____

☐ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

I was born in the year: _____

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

My disability or perceived disability is: _____

☐ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

## B. Other Claims

In addition to my federal claims listed above, I assert claims under:

☒ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☒ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☐ Other (may include other relevant federal, state, city, or county law):

_____

## IV.   STATEMENT OF CLAIM

### A.  Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

☐   did not hire me

☐   terminated my employment

☒   did not promote me

☐   did not accommodate my disability

☒   provided me with terms and conditions of employment different from those of similar employees

☒   retaliated against me

☐   harassed me or created a hostile work environment

☒   other (specify):    Maintained discriminatory pay rate each paycheck (continuing violation)

### B.  Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

From 2016 to the present I, a Black Hispanic male of Dominican origin, have been paid Thousands

of dollars less each year than White and Asian coworkers with the same Certified IT Administrator (LAN/WAN) Level IV

title and equal or greater duties. Example: Slawomir Lyzwa, hired 12/21/15  at the maximum rate of $134,000 now earns $172,297 while my salary is $139,501 despite equal or greater duties. I filed a grievance (Oct 2022), a NY-SDHR complaint (Oct 14 2022), and an EEOC charge on (Apr 23 2024). DSNY refused to correct my pay, citing "budget constraints" and compared me  to peers at lower levels with lesser duties. These disparities recur with each paycheck

(Lilly Ledbetter paycheck-accrual). Exhibits A–F are incorporated by reference.

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

## V.    ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☒   Yes (Please attach a copy of the charge to this complaint.)

When did you file your charge?   **04-23-2024**

□   No

Have you received a Notice of Right to Sue from the EEOC?

☒   Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice?   **Date on notice: 06/13/2025**

When did you receive the Notice?   **Date received: 06/13/2025**

□   No

## VI.    RELIEF

The relief I want the court to order is (check only those that apply):

□   direct the defendant to hire me

□   direct the defendant to re-employ me

□   direct the defendant to promote me

□   direct the defendant to reasonably accommodate my religion

□   direct the defendant to reasonably accommodate my disability

☒   direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)

Adjust my salary to the maximum rate (top step/top pay) for Certified IT Administrator (LAN/WAN) Level IV

Award back pay from Jan 6 2020 – present (plus interest) front pay until pay is corrected , and compensatory damages as permitted by the  Title VII/NYCHRL. Grant injunctive relief (correct title/level and pay; no retaliation), costs, and reasonable attorney's fees as allowed by statute, and such other relief as the Court deems just and proper

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass,
cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are
supported by existing law or by a nonfrivolous argument to change existing law; (3) the
factual contentions have evidentiary support or, if specifically so identified, will likely
have evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements of Federal
Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I
understand that my failure to keep a current address on file with the Clerk's Office may
result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to
proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 08-20-25 | | _Rafael Vanderpool_ (signature) |
|---|---|---|
| Dated | | Plaintiff's Signature |
| Rafael | A | Vanderpool |
| First Name | Middle Initial | Last Name |
| 330 Birch Drive | | |
| Street Address | | |
| Roselle | NJ | 07203 |
| County, City | State | Zip Code |
| 9086037294 | | r.vanderpool@gmail.com |
| Telephone Number | | Email Address (if available) |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes    ☒ No

If you do consent to receive documents electronically, submit the completed form with your
complaint. If you do not consent, please do not attach the form.

# Exhibit A

EEOC Closure Notice / Right-to-Sue

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Houston District Office**
1919 Smith Street, 6th Floor
Houston, TX 77002
(346) 327-7700
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 06/13/2025

**To:** Mr. Rafael Vanderpool
330 Birch Drive
Roselle, NJ 07203
Charge No: 520-2024-04665

EEOC Representative and email:   ARACELI CASTILLO
Investigator
araceli.castillo@eeoc.gov

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 520-2024-04665.

On behalf of the Commission,

Digitally Signed By:Rayford O. Irvin
06/13/2025
Rayford O. Irvin
District Director

**Cc:**
Incident Location
New York City Department of Sanitation
375 Pearl Street 19th Floor
New York, NY 10038

Kimberly Brown
44 Beaver Street
New York, NY 10004

Eric M Nelson Esq.
Attorney at Law
521 Fifth Avenue 17th Floor
New York, NY 10175


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC
*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

**IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT**

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

**ATTORNEY REPRESENTATION**

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

**HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS**

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 520-2024-04665 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 520-2024-04665 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAFAEL VANDERPOOL,
Plaintiff,
v.
CITY OF NEW YORK,
Defendant.

Case No. _____

EXHIBIT INDEX IN SUPPORT OF COMPLAINT

Plaintiff respectfully submits the following exhibits in support of the Complaint.
Plaintiff incorporates these exhibits by reference in Section IV(B) of the Complaint.
Exhibit A: EEOC Closure Notice / Right-to-Sue (dated June 13, 2025).
Exhibit B: EEOC Charge of Discrimination and Sworn Declaration (filed April 23, 2024).
Exhibit C: Respondent (DSNY) Position Statement to the EEOC.
Exhibit D: Complainantâ€™s Rebuttal to DSNY Position Statement (letter dated October 30, 2024).
Exhibit E: Comparator & Raises Summary (condensed from plaintiff detailed research).
Exhibit F: Back Pay Calculation Summary (1 page).

Service & Party Note: The City of New York is named as the defendant; DSNY (Department of Sanitation) is referenced as the employing agency.
Service address for the City of New York (not a party designation): NYC Law Department, 100 Church St, New York, NY 10007.

# Exhibit B

EEOC Charge of Discrimination and Sworn Declaration

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | ☐ FEPA<br>☒ EEOC | |

_____ and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| RAFAEL A. VANderfooL | 908-603-7294 | 08-16-74 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 330 birch Dr. | RoseLLe, NJ 07203 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two are named, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (incl. Area Code) |
|---|---|---|
| NYC Department of SANiTATioN | > 9,000 | 646-885-0900 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 375 PenRL St 19 FL | New YOYK   10038 | |

| Name | No. Employees, Members | Phone No. (incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE    ☒ COLOR    ☐ SEX    ☐ RELIGION    ☒ NATIONAL ORIGIN

☒ RETALIATION    ☐ AGE    ☐ DISABILITY    ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE

Earliest  09-2006    Latest  Present

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

PLeAse see ACCoMPANYing sworN dechAYATion

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

| 4-23-2024 | Rafael A. Vanderpool |
|---|---|
| Date | Charging Party Signature |

NOTARY – When necessary for State or Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

Rafael A. Vanderpool

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

04/23/2024

MARIA S RAMOS
NOTARY PUBLIC
STATE OF NEW JERSEY
MY COMMISSION EXPIRES AUG. 20, 2028

UNITED STATES
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
------------------------------------------------------------------X

RAFAEL VANDERPOOL,

                              Charging Party,

                -against-

CITY OF NEW YORK and THE CITY OF NEW YORK
DEPARTMENT OF SANITATION,

                              Respondents.

------------------------------------------------------------------X

EEOC Charge No.
520-2024-_____

**SUPPORTING
DECLARATION OF
CHARGING PARTY
RAFAEL VANDERPOOL**

Pursuant to 28 U.S.C. § 1746, **RAFAEL VANDERPOOL** declares, under penalty of perjury:

1.      I am a current employee of respondent City of New York ("NYC"), specifically respondent New York City Department of Sanitation ("DSNY") (together, "Respondents"). I began my employment with Respondents in September 2006, and have been employed therewith continuously from that date through and including the date of my execution hereof. I am a Black Hispanic male, of Dominican (Republic) national origin.

2.      I began working for Respondents in September 2006 as a "Computer Associate, Software Level I" in DSNY's Bureau of Information Technology ("BIT"). Thereafter, and over what has now been seventeen-and-one-half (17½) years of loyal service, my impeccable record has nevertheless left me at a salary that has been consistently lower than that of my colleagues from other ethnic backgrounds and national origins who have, and who have had, the very same title and responsibilities as I did and do.

3.      I hold both a Bachelor of Science ("B.S.") degree in Computer Science, and a Master's degree ("M.S.") in Information Management Systems and, at all times relevant herein, have been the only Black Hispanic LAN/WAN Computer Associate for DSNY. Nevertheless, and based upon the events and circumstances that have occurred over that time (some of the most pertinent of which I describe

hereinbelow), I respectfully submit that I have for many years been (and indeed, continue to this day to be) paid a salary inferior to that of my peers with the same duties and responsibilities, and have also suffered multiple denials of (or failures by DSNY to even consider me for) various promotions because of my color (Black), ethnicity (Hispanic), and national origin (Dominican).

4.      Most notably, each and all of these denials have occurred at the behest of my principal superiors, DSNY Chief Information Officer ("CIO") Edmund Lee ("Lee"), who is Asian, and Deputy CIO Panos Mastrogiannis ("Mastrogiannis") and Director William Pepitone, both of whom are Caucasian.[1] Mr. Lee and Mr. Mastrogiannis in particular had and have, together or separately, discretionarily increased the pay, and promoted, many of my peers over the relevant period . . . as long as they were/are Asian or Caucasian. This has occurred, moreover, even though, in almost every instance, I have had superior qualifications, more relevant experience, and/or substantially longer service (*i.e.*, seniority) at DSNY than those who have been promoted over me, and paid more than I am paid.

**History and Background**

5.      When I began my employment with DSNY in 2006, my starting salary was $56,280. Thereafter, and to this day, I have received only two (2) non-contract-related salary increases, one in 2012 (from $64,574 to $85,000), and the second in 2018 (from $95,699 to $112,000).[2]

6.      Since I serve in a unionized position, I have also received various increases under the terms of the collective bargaining agreement ("CBA") governing my position. Those increases, however, were never unique to me; they were provided to every other unionized employee covered by the same CBA as I

---

[1]      Both Mr. Mastrogiannis and Mr. Pepitone left DSNY in 2022, but Mr. Lee continues in his role to this day.

[2]      My second (and last) non-contract-related salary adjustment, moreover, was only given to me after I attended a city-wide employee "hiring pool" and received a job offer from another agency – the New York City Department of Information Technology and Telecommunications ("DOITT") (which has since changed its name/acronym to the Office of Technology and Innovation ("OTI")) – at the then-maximum rate for my title ($112,000). DSNY matched DOITT's offer, at least in part, because I was, at the time, a key participant in a very important project for DSNY. It thus did not want to lose me (at least at that time).

2

was/am, including: (a) all employees serving in the same title as I do (*i.e.*, Computer Associate/Computer Specialist Software); (b) all other Computer Systems Managers (CSM); and (c) all Certified IT Developers (CID).

7.    Most particularly, the salary shortfalls I have suffered have been experienced in multiple ways. First, most of my peers were hired at the maximum permissible salaries for their positions, whereas I was not. Second, even when I was at least nominally "promoted," I was still not given the maximum amount allowable for my new "level." And third, over the past several years, my Caucasian and Asian colleagues have received one or more discretionary (*i.e.*, non-contract-related) increases (from our Caucasian and Asian bosses, most particularly Mr. Lee), while I, contemporaneously, was repeatedly being denied the same.

8.    I made many requests for salary increases and/or promotion over the years, both within my official civil service title as well as otherwise.[3] For example, on May 5, 2016, I passed the New York City Department of Citywide Administrative Services ("DCAS") "examination" for Certified IT Administrator (WAN/LAN) with a perfect score (100).[4] I was nevertheless not given the appropriate salary "bump" – one which would ordinarily have come with such an accomplishment – even though I even made my own, specific request for a promotion to "at least level 2" (with its associated higher pay) to my immediate supervisor, Mr. Pepitone, the very next day (May 6, 2017). His response when I asked was simply, "[t]itles

---

[3]    For clarity, a "civil service title" is the formal title associated with the position into which a particular individual is hired by the City of New York. An "office title" is more informal, and is used to better describe the actual job function or role that that individual performs. The latter is also used for promotion and salary increase purposes.

[4]    I was also notably awarded "Employee of the Month" that month. Approximately ten (10) months later, on or about March 1, 2017, DCAS published the list of those who had passed. Approximately two months after that, on or about April 24, 2017, I received an email from DSNY's Director of Human Resources Kisha Shrouder advising of a citywide "hiring pool" for those who had succeeded on the exam. Five (5) days later, I replied with all the information required to change my title from a provisional title of "Computer Specialist - Software" to a permanent title of "Certified IT Administrator (WAN/LAN)." That change took effect on May 16, 2017.

3

are easy, money increases are hard." Apparently that was so in my case but, as the discussion below makes clear, it was not so for my Caucasian and Asian peers.

9.     I am not certain which, if not all, of Mr. Pepitone, Mr. Lee and Mr. Mastrogiannis made the decision to deny the salary increase to me on that particular occasion but, earlier in 2016, I had made two (2) separate direct requests – one to Mr. Mastrogiannis and the other to Mr. Lee – several weeks apart, also requesting a raise. Both requests were denied.[5]

10.     Other requests I made were similarly rebuffed, often with the explanation (excuse) of "budget cuts," or statements like the one by Mr. Pepitone noted above. Where my Caucasian and Asian peers were concerned, however, different rules seemed to apply. While I received the same (negative) answer to my requests year after year, for example, they in fact received non-contract-related salary increases, in some cases *multiple* times. More than a dozen of my colleagues – those that I have been able to obtain the compensation details for (mostly by using the publicly-accessible *SeeThroughNY* website, *https://seethroughny.net*) are noted in paragraphs 17 through 31 below so that the Commission can see for itself how my Asian and Caucasian peers were repeatedly and consistently favored.

11.     On October 14, 2022, I filed a grievance for "out of title" work, and my union, District Council 37 of the Service Employees International Union ("SEIU") (hereinafter, "DC37") assisted me in having my title changed from "Level 1" to "Level 4" (*i.e.,* Certified IT LAN/WAN Level 4). Even that change in title, however, failed to include any salary increase or other addition to my compensation.

12.     Throughout my tenure, Respondents have consistently, and repeatedly, denied me additional compensation. Most frequently, their claimed basis for doing so was that: (a) I was receiving more than the "minimum" rate of pay for my "level"; and (b) my rate of pay was "in line" with my colleagues who were/are carrying out similar responsibilities. For the reasons more fully described below, however, these purported

---

[5]     Both Mr. Mastrogiannis and Mr. Lee, moreover, had used "city budget constraints" as the purported excuse for their denials.

4

explanations are pretexts for the real reasons I have been consistently undercompensated, to wit, my color, ethnicity and where I come from.

13.     The only DSNY-initiated change in my position over my entire 17+ years with Respondents came in 2012, when my title was nominally changed from "Computer *Associate* Software" to "Computer *Specialist* Software (provisional)." (Italics added.)[6] Even the salary increase that automatically accompanies that promotion, however, was in my case still, in large part, denied to me. Specifically, I had been earning $ 64,574, and received an increase to $85,000 per annum, whereas the salary to which I could have been increased at that time was $94,602, almost $10,000 more than I was actually granted.[7] This higher rate, however, was never offered to me. Notably, though, it *was* offered to several of my Caucasian and Asian coworkers when they were similarly promoted. *See* discussion below.

14.     As of the date of my execution hereof, I am still a "Certified IT LAN/WAN Level 4" ("CLWL4"), and currently receive an annual salary of $131,127. The salary range for employees in my position, however, is $124,282 to $163,119 so, notwithstanding my almost two decades of service, I am still paid at close to the bottom of the salary range applicable to my position. This is also true notwithstanding: (a) the already one-and-one-half (1½) years that had passed since my title had finally been changed (*see* ¶ 11) from Level 1 to Level 4; (b) the unduly long period prior to that during which I had been improperly kept at Level 1; and (c) the continuing failure by DSNY to promote me to a higher position (and the higher annual compensation associated therewith) overall.

---

[6]     I say "nominal" because even as a "Computer *Specialist* Software (provisional)," I was still classified as, and considered to be, a Computer Associate. It was merely a change in title, not a promotion.

[7]     As noted elsewhere herein, over the course of my career, I have also had my title changed from "Computer Specialist Software (provisional)" to "Certified IT Administrator (LAN/WAN),", and my level changed from Level 1 to Level 4. Neither of these changes, however, were initiated by DSNY. The former occurred in May 2017 because, as noted above, I had passed the DCAS IT Administrator (LAN/WAN) exam (in May 2016). *See* ¶ 8 above. The latter occurred in November 2022 because I had brought, and succeeded on, a grievance earlier that year based upon the more advanced duties I was actually performing, and the more significant responsibilities I was actually holding. *See* ¶ 11 above.

5

15.    Even these repeated denials of pay equity on the basis of my color, ethnicity and national origin were not all the discrimination that I experienced. In late 2019, I received an offer from Robin Perez, who was then the Director of DSNY's Network Infrastructure (and one of the only other Latinos in IT at DSNY). It was to be a lead/manager working under him. My consideration for the position, however, was almost immediately thereafter rejected by Deputy CIO Mastrogiannis, without explanation, again denying me any meaningful opportunity at career advancement.[8]

## My Non-Hispanic Comparators, All of Whom
## Have Been Promoted and/or Paid More Than I Have

16.    As noted briefly above, I have numerous colleagues who: (a) have either served or are currently serving in positions which are the same as, or substantially similar to, mine; (b) have educational backgrounds and training similar or inferior to mine; and (c) who have less experience and/or lesser responsibilities than I have (and/or have had), but who have been: (i) promoted over me; (ii) paid more than I am paid, or (iii) both. While I am not aware of all, those of whom I am aware are listed (with their substantially more favorable compensation circumstances described) below. *The only relevant distinction between us is that I am Black, Hispanic and Dominican, and they are not.*

17.    Slawomir Lyzwa (Caucasian) is a consultant who was hired at my current level (*i.e.,* CLWL4) on December 21, 2015, more than nine (9) years after I was. He has the same level of responsibility as I do. His starting salary was $134,000 – not the minimum incumbent rate, but rather the *maximum* rate

---

[8]    Notably, Mr. Perez himself left DSNY in or about May 2022, for reasons similar to those I am claiming here (*i.e.,* discriminatory treatment). For example, even though he was a Director, and responsible for both DSNY's server team and network team, he learned that several of his subordinates were being paid higher salaries than he was. In a fashion eerily similar to my own efforts, he, too, tried to raise this issue (multiple times) with Messrs. Lee and Mastrogiannis. No action, however, was ever taken by either of them to in any way remedy the situation, so Mr. Perez eventually found himself with no real alternative but to resign. He thereupon accepted a position in the private sector – as the only real way to meaningfully continue his career.

Kindly note that Mr. Perez is willing to testify to each/all of these facts and circumstances as part of the Commission's investigation of this (my) charge.

6

for our position at the time. Mr. Lyzwa's salary as of June 2023, moreover, has increased to at least $162,014.

18.     Qin Bibin (Asian) was also hired at my current level (*i.e.*, CLWL4) in 2015, nine (9) years after I was. His starting salary was also not the minimum incumbent rate (as mine was), but rather $145,022, the maximum rate for our position at the time. His salary as of June 2023 had increased to at least $163,224.

19.     Hang Pang (Asian) was hired at my current level on October 27, 2014, more than eight (8) years after I was. His starting salary was not the minimum incumbent rate (as mine was), but rather $115,000, the maximum rate for our position at the time. Approximately two (2) years later, in 2016, Mr. Pang received a raise apart from (*i.e.*, not attributable to) our union contract, to $134.914. His salary as of June 2023 has increased to at least $163,119.

20.     Jimmy Cheung (Asian) was also hired at my current level, on March 6, 2017. His starting salary was $118,000, but has increased, as of June 2023, to at least $148,071.00.

21.     Hecker William (Caucasian) was also hired at my current level, on May 2, 2022. His starting salary was $139,222.00 – more than I am paid *today*, after almost eighteen (18) years of service. As of June 2023, moreover, his salary had increased to at least $152,132.

22.     All four of above-named individuals are current employees with precisely the same title and responsibilities as I hold. All four, however, were hired years after I was, the latter two *more than a full decade* later. Every one of the four, however, is paid a substantially higher annual salary than I am and, notably, is either Asian or Caucasian.

23.     Xandree Norville (Caucasian) was hired as a Computer Systems Manager ("CSM"), a position similar to, although not exactly the same as, mine, on or about April 4, 2016. Her starting salary was $126,000, the maximum incumbent rate for CSMs at the time. In 2019, Ms. Norville received a non-contract-related salary increase to $140,768. Ms. Norville left DSNY in 2023. At the time of her departure, Ms. Norville's salary had increased to at least $144,991.

7

24.     Monika J. Macieszkiewicz (Caucasian) was hired as a CSM in 2015. Her starting salary was $125,000, the maximum incumbent rate for CSMs at the time. In 2019, Ms. Macieszkiewicz received a non-contract-related salary increase to $144,713. In 2021, she received another non-contract-related salary increase, this time to $149,057. And in 2022, she received yet a third (3rd) non-contract-related salary increase, this time to $152,761. Ms. Macieszkiewicz's salary as of June 2023, moreover, has increased to at least $157,997.

25.     Rehman Faisals (Asian/Pacific Islander) was hired into the same position as I presently hold (CLWL4) on January 30, 2017. His starting salary was $105,875. In 2023, I understand Mr. Faisals to have received *two (2)* non-contract-related salary increases, the first to $124,402, and the second, in or about July 2023, to at least $136,842.

26.     Christine T Lombard (Caucasian) was hired as a CSM on September 4, 2018 at a starting salary of $132,925, the maximum incumbent rate for that position at the time. Ms. Lombard thereafteer received two non-contract-related salary increases: the first, in 2021, to $136,913, and the second, in April 2022, to $147,866. Ms. Lombard's salary as of June 2023 had increased to at least $161,228.

27.     Sreenivas Koonadi (Asian/Pacific Islander) was hired as a Certified IT Developer ("CID"), another position similar to mine, in 2018. His starting salary was $135,584, again the maximum incumbent rate for his position at the time. In 2022, Mr. Koonadi received a non-contract-related salary increase to $149,277. Mr. Koonadi's salary as of June 2023 had increased to at least $162,837.

28.     Shih-Pin Young (Asian) was hired as a CSM in 2017, at a starting salary of $130,000, the maximum incumbent rate for CSMs at the time. He thereafter received at least *three (3)* non-contract-related salary increases, first to $146,634 (in 2020), then to $153,966 (in 2022), and finally to $179,344 (in 2023).

29.     Irene Nayer (Caucasian) was hired as a CSM in 2016, at a starting salary of $130,000, the maximum incumbent rate for CSMs at the time. She thereafter received *two (2)* non-contract-related salary increases, first to $148,156 (in 2022), and then to $161,756 (in 2023).

8

30.    Daniel Starobin (Caucasian) was hired as a CSM in 2015, at a starting salary of $104,508. He thereafter received *five (5)* non-contract-related salary increases, first to $124,000 (in 2018), then to $137,086 (in 2019), next to $141,199 (in 2020-21), then to $150,377 (in 2022), and finally to $160,903 in 2023.

31.    Joseph Morano (Caucasian) was hired as a provisional CSM in September 2016, at a starting salary of $120,000, the maximum rate for provisional CSMs at the time. He thereafter received *four (4)* non-contract-related salary increases, first to $125,000 (in 2018), then to $130,373 (in 2019), next to $134,248 (in 2020) and finally to $147,712 (in 2023). He was also promoted to Deputy Director of Technology Operations in May 2022, after less than six (6) years with DSNY (as compared to my 17½). Mr. Morano's salary as of June 2023 has increased to at least $161,409.

32.    Finally, Ahamefule Maduka (Black) who was Chief of Information Security ("CISO"), left the agency in 2021 at an annual salary of $148,266. His replacement, Satt Moshe (Caucasian), was hired at a salary almost $20,000 higher, to wit, $168,226. Mr. Maduka's position was not comparable to mine, but he is yet another example of the disparate treatment of Black employees, as compared to those who are Caucasian or Asian. And perhaps most notably, the people responsible both for replacing Mr. Maduka, a Black executive, with Mr. Moshe, a Caucasian one, and paying him $20,000 more (annually) in the process, were again Messrs. Lee and Mastrogiannis.

## My Charge of Discrimination and Retaliation

33.    On the basis of the foregoing, I charge Respondents with discriminating against me on the basis of my color, my ethnicity and my national origin, and retaliating against me for complaining thereof. In so doing, I charge Respondents with violating Title VII of the Civil Rights Acts of 1964 and 1991, as amended; 42 U.S.C. § 1981; the New York State Human Rights Law; the New York City Human Rights Law; the New York Equal Pay Act; and any and all other applicable federal, state, local and common laws prohibiting discrimination on the basis of national origin and/or ethnicity.

9

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed:     New York, New York
              April 23, 2024

                                          _____
                                              RAFAEL VANDERPOOL

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed:    _____, _____
             April ___, 2024

_____
RAFAEL VANDERPOOL

10

# Exhibit C

Respondent (DSNY) Position Statement to the EEOC.

**sanitation**
Jessica S. Tisch Commissioner

**Kimberly Brown**
Executive Agency Counsel
Bureau of Legal Affairs

125 Worth Street
Room 710
New York, NY 10013
nyc.gov/sanitation

646-885-5008
kimbrown@dsny.nyc.gov

July 19, 2024

**Via Electronic Submission**
Rury Arzu
Investigator
U.S. Equal Employment Opportunity Commission
33 Whitehall Street
New York, New York 10004

Re:  Vanderpool, Rafael v. City of New York and NYC Department of
Sanitation
        EEOC Charge No. 520-2024-04665

Dear Investigator Arzu:

Please allow the following to set forth Respondent, the New York City Department of Sanitation's ("DSNY") position with respect to the allegations in the charge of discrimination filed by Rafael Vanderpool ("Charging Party") on or about April 23, 2024, charging disparate pay on the basis of race, color and national origin and retaliation in violation Title VII, 42 U.S.C. § 1981, and State and City human rights and equal pay laws.

For the reasons set forth herein, Charging Party's claims of discrimination are entirely without merit.  Therefore, DSNY respectfully requests that the Equal Employment Opportunity Commission ("the EEOC") dismiss the charge in its entirety, or, in the alternative, issue a finding of no probable cause.

**PROCEDURAL HISTORY**

On October 14, 2022, Charging Party filed a complaint with the New York State Division of Human Rights ("SDHR"), which was dual filed

New York's Strongest

with the EEOC,[1] alleging the same claims as his instant charge, that is, that other employees who are not Black and Hispanic, have received higher compensation and unspecified promotions. On August 10, 2023, the SDHR issued a finding of no probable cause following its investigation into Charging Party's claims. Specifically, the SDHR found that there was no evidence to support Charging Party's race/color and national origin discrimination allegations. The SDHR found persuasive the facts that the employees who hold the same civil service title as Charging Party and earn higher base salaries than Charging Party, all work in different units, held different former titles, and served in the title longer than Complaint and all were appointed at different dates. The SDHR also found that Charging Party was not considered and/or selected for promotion to "Computer Systems Manager" because his name did not appear on the City's Eligible to Hire List, as he did not take the qualifying civil service examination. Accordingly, the SDHR correctly dismissed the complaint finding there was "no nexus because Charging Party's membership in the protected classes and the alleged acts of discrimination."[2]

## STATEMENT OF FACTS

Charging Party self-identifies as a Black Hispanic male, of Dominican (Republic) national origin. Charging Party was hired in the competitive civil service title of Computer Associate (Software) Level I, on September 11, 2006. On March 26, 2012, DSNY provisionally appointed Charging Party to the competitive civil service title of Computer Specialist (Software) Level II, with a salary increase. On May 16, 2017, DSNY promoted Charging Party to the competitive civil service titled of Certified IT Administrator (LAN/WAN), Level I, with a salary increase. On November 7, 2022, DSNY granted Charging Party a level change with salary increase to his current role, Certified IT Administrator (LAN/WAN), Level IV.

Charging Party is assigned to work in DSNY's Bureau of Information Technology ("BIT"). Within BIT, Charging Party works as Server Support for the DevOps team, a subset of IT Services. In his role as Server Support, Charging Party provides technical support for a specific set of web applications, troubleshoots glitches and develops solutions to prevent future issues. Charging Party does not manage any employees, and he reports directly to the manager of the DevOps team, Michael Tsuji, who in turn reports to Director of IT Services, Navi Grewal. There are two other people on the DevOps Team with Charging Party all of whom report to Michael Tsuji, and Charging Party is the highest paid person on the team. The other two team members self-identify as (i) Asian; and (ii) Hispanic and two or more races.

Charging Party has received 22 pay increases since his date of hire, including two merit raises in addition to the 20 collective bargaining increases he has received. Charging Party's current salary is $135, 085, and his starting salary when he was hired in 2006, was $56, 280. The current minimum hiring rate for his civil service title, Certified IT Administrator (LAN/WAN), Level IV, is $111,313, the maximum rate is $163,013, and the incumbent rate is $128,010. Charging Party's salary is nearly $24,000 more than the minimum hiring rate, and $7,000 more than the incumbent rate.[3] Although Charging Party has been in the Certified IT Administrator (LAN/WAN), Level IV, title for the shortest amount of time as compared to all employees holding

---

[1] Federal Charge No. 16GC300181

[2] A copy of the SDHR's dismissal dated August 10, 2023, is annexed hereto.

[3] City employees reach the incumbent rate after 2 years of service.

the same title within BIT, he nevertheless earns a higher salary than one other employee in the same title, who self-identifies as Asian and was hired five months prior to Charging's Party's appointment.

## ARGUMENT

At the threshold, Charging Party's instant charge should be dismissed in light of the SDHR's finding of no probable cause on Charging's Party's October 2022 complaint dual filed with the EEOC, alleging the same claims herein. "State law governs the preclusive effects in federal court of a state administrative agency's quasi-judicial findings." Matusick v. Erie Co. Water Auth., 757 F.3d 31, 45 (2d Cir. 2014). Under New York law, "collateral estoppel precludes a plaintiff from contesting in a subsequent action issues clearly raised in a prior proceeding and decided against that party, irrespective of whether the tribunals or causes of action are the same." El-Shabazz v. State of New York Comm. on Character & Fitness, 428 F. App'x 95, 96-97 (2d Cir. 2011). To that end, where a plaintiff first raises a claim with the SDHR, and the SDHR reaches a finding of "no probable cause," plaintiff is precluded from bringing a subsequent action on the same operative facts. See e.g. Sullivan v. New York City Dep't of Investigation, 2014 U.S. Dist. LEXIS 42109, at *6-10 (S.D.N.Y. 2014); Johnson v. County of Nassau, 411 F. Supp. 2d 171 (2006).

Moreover, several of plaintiff's claims are time barred. Indeed, all claims that accrued prior to June 28, 2023 (300 days prior to April 23, 2024, the day of filing the instant charge), are barred by the 300-day statute of limitation. To that end, the claims and allegations in paragraphs 7-11, 15 should be dismissed as untimely. Notably, as respects Charging Party's time-barred allegations, both Panos Mastrogiannis and William Pepitone left DSNY in 2022, and thus have no relevance to Charging Party's current claims. Moreover, the Deputy Commissioner of BIT, Michelle Coke, self-identifies as Black/African American. Thus, any argument by Charging Party that BIT is permeated with discriminatory animus against people of color, is belied by the fact that the head of the Bureau is within his protected class.

In addition to these procedural deficiencies which require dismissal of Charging Party's charge, the charge should also be dismissed as there is no evidence of discrimination. To state an employment discrimination claim under Title VII, "a plaintiff must plausibly allege that (1) the employer took adverse action against [her] and (2) [her] race, color, religion, sex, or national origin was a motivating factor in the employment decision." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015). A plaintiff may establish the requisite inference of discrimination when she alleges that her employer treated her less favorably that individuals outside of her protected group. Littlejohn v. City of New York, 795 F.3d 297, 312, (2d Cir. 2015). Generally, to "establish an inference of discrimination based on a showing of disparate treatment, [a plaintiff] must plead that 'she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" Hernandez v. Premium Merch. Funding One, LLC, 19-cv-1727 (WHP), 2020 U.S. Dist. LEXIS 122643, at *25 (S.D.N.Y. July 13, 2020) citing Grahan v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). "Employees are not 'similarly situated' merely because their conduct might be analogized." Mazzella v. RCA Global Communications, 642 F. Supp. 1531, 1547 (S.D.N.Y.1986]) aff'd 814 F.2D 653 (2d Cir.1987).

Here, none of the alleged comparators are similarly situated to Charging Party, much less similarly situated in all material respects, for several reasons. First, many of the alleged comparators are Computer System Managers, a separate, and higher, civil service title than Charging Party's, a fact Charging Party concedes in his Charge. Not only do these individuals hold higher civil service titles than Charging Party, but they also hold more significant office titles, work in separate units, and perform complex managerial work. Charging Party does not manage any employees and has not taken the promotional exam for Computer Systems Manager.

For example, Monika Macieszkiewicz: (i) is the Director of IT Administration, (ii) works in the Management Information Systems Office, and (iii) has been employed in the civil service title Computer Systems Manager for nearly 9 years, since her date of hire on December 29, 2015.

Christine Lombardi: (i) is the Director of IT Policy & Standards, (ii) works in the Management Information Systems Office, and (iii) has been employed in the civil service title Computer Systems Manager, for nearly six years, since her date of hire on September 4, 2018.

Shih-Pin Young: (i) is the Deputy Director, Project Management & Business Analysis, (ii) works in the Management Information Systems Office, and (iii) has been employed in the civil service title Computer Systems Manager for seven years, since his date of hire on May 30, 2017.

Irene Nayer: (i) is the Program Coordinator, (ii) works in the Management Information Systems Office, and (iii) has been employed in the civil service title Computer Systems Manager for nearly nine years, since her date of hire on November 2, 2015.

Daniel Starobin: (i) Director of Solutions Architecture, (ii) works in the Management Information Systems Office, and (iii) has been employed in the civil service title Computer Systems Manager for ten years, since he was appointed on July 27, 2014.

Xandree Norville: (i) was the Director, Project Management, (ii) worked in the Management Information Systems Office, and (iii) had been employed in the civil service title Computer Systems Manager, for nearly 7 years, from her date of appointment on April 11, 2016 until her transfer to another city agency on April 2, 2023.

Similarly, Streevanis Koonadi: (i) is the Lead Database Administrator (ii) works in the Management Information Systems Office, and (iii) has been employed as a Certified IT Developer, Level IV, a separate and distinct civil service title than Charging Party, for nearly six years, since his date of hire on August 27, 2018.

Joseph Morano: (i) is the Deputy Director of IT Support; (ii) works in the Management Information Systems Office, and (iii) was hired on September 12, 2016, as a provisional Computer System Manager, a higher civil service title than Charging Party, but was reassigned to his prior civil service title, Certified IT Developer, Level IV, on January 21, 2020. As noted above, Charging Party directly reports to Michael Tsuji, who in turn, reports to Joseph Morano.

The remaining alleged comparators are not also similarly situated to Charging Party because they: (i) have held the Certified IT Administrator (LAN/WAN), Level IV, civil service

title for several years longer than Charging Party, who has been employed as a Level IV for only 20 months; (ii) work in different units with separate office titles and job functions.

For example, Jimmy Cheung: (i) has been employed as a Certified IT Administrator (LAN/WAN), Level IV for more than seven years, since his date of hire on March 6, 2017; and (ii) currently works as Server Support in the Server/Application Support Unit.

Faisal Rehman: (i) has been employed as a Certified IT Administrator (LAN/WAN), Level IV for more than 7 years, since his date of hire on January 30, 2017; and (ii) currently works as a Manager, Network Support in the IT Operations Unit.

Hang Pan: (i) has been employed as a Certified IT Administrator (LAN/WAN), Level IV, for more than eight years, since January 2016; and (ii) currently works as the Deputy Director, Server/Application Support, in the Server/Application Support Unit.

Bibin Qin: (i) has been employed as a Certified IT Administrator (LAN/WAN), Level IV, for more than six years, since his date of hire October 2018; and (ii) currently works as a Database Developer in the Database Architecture Unit.

William Hecker: (i) has been employed as a Certified IT Administrator (LAN/WAN), Level IV, for nearly six years, since his date of hire on October 2018; and (ii) currently works as a Server Associate (Security) in the Server/Application Support Unit.

Slawomir Lyzwa: (i) has been employed as a Certified IT Administrator (LAN/WAN), Level IV, for nearly nine years, since his date of hire on December 21, 2015, and (ii) currently works as Server Support in the Server/Application Support Unit.

By comparison, Charging Party has been employed as a Level IV for only 20 months, and works in the DevOps Unit, where he is the highest paid person on the team of non-managers. Indeed, Charging Party earns more than the one other employee on the same team who also works as Certified IT Administrator (LAN/WAN), Level IV, and has worked in that role for months longer than Charging Party, a fact not surprisingly omitted from the instant charge. Moreover, none of the purported comparators share any similarities with Charging Party, other than working in the same Bureau. Accordingly, his claims are without merit and his charge should be dismissed. See e.g., Uwoghiren v. City of New York, 148 A.D. 3d 457, 458 (1st Dep't 2017) (holding that plaintiff failed to make a prima facie showing in support of his claim that he was paid less than a another employee with the same civil service title, because "they were not similarly situated in light of the differences in their experience, the other employee's earlier salary, and their differing job responsibilities").

Lastly, insofar as Charging Party's charge can be liberally construed as stating a claim for failure to promote, that claim too must be dismissed as Charging Party did not take the qualifying civil service examination for Computer Systems Manager, and therefore he does not appear on the City's Eligible to Hire List for that promotional title.

## **CONCLUSION**

Charging Party is unable to establish a claim of race/color and national origin discrimination. Therefore, DSNY submits that the charge is wholly without merit and the EEOC should dismiss the charge in its entirety, or, in the alternative, issue a finding of no probable cause.

Thank you for your consideration.

Respectfully submitted,

/s/
Kimberly K. Brown

# Exhibit D

Complainant Rebuttal to DSNY Position Statement

# ERIC M. NELSON

### ATTORNEY AT LAW

521 FIFTH AVENUE
SEVENTEENTH FLOOR
NEW YORK, NEW YORK 10175

MEMBER
N.Y. & D.C. BARS

TELEPHONE: (212) 354-3666
TELECOPIER: (212) 354-2555

October 30, 2024

*BY EMAIL ONLY*
*rury.arzu@eeoc.gov*
Ms. Rury Arzu
Federal Investigator
U.S. Equal Employment Opportunity Commission
33 Whitehall Street
New York, New York 10005

Re:    *Rafael Vanderpool v. New York City Department of Sanitation*
Charge No. 520-2024-04665

Dear Ms. Arzu:

I am counsel to charging party Rafael Vanderpool ("Charging Party" or "Mr. Vanderpool") with respect to the above-referenced charge of discrimination (the "Charge") and, in particular, the race, national origin and ethnicity discrimination and retaliation to which he has been subjected while an employee of the New York City Department of Sanitation ("Respondent" or "DSNY"). The July 19, 2024 position statement submitted by Respondent in this matter (the "Position Statement" or "PS") was recently made available to us, and this letter is respectfully submitted in rebuttal to its numerous false or otherwise misleading assertions.

## RESPONDENT'S POSITION STATEMENT GENERALLY

At the threshold, Mr. Vanderpool notes that Respondent's Position Statement fails to even address, much less substantively respond to, much of the sworn Charge he has previously submitted.[1] Instead, Respondent has submitted only what is essentially a lawyer's summary, a document reflecting absolutely no first-hand knowledge of any of the events or circumstances at issue herein. That summary, moreover, barely does more than "cherry pick" certain aspects of Mr. Vanderpool's Charge, misrepresent the actual circumstances in multiple respects, and assert, with respect to Mr. Vanderpool, a host of allegations that are not merely wholly unsubstantiated, but flatly false.

As the discussion below makes clear, it is not the sworn statements in Mr. Vanderpool's Charge, but rather the purportedly-factual-but-actually-wholly-unsupported-and-thus-unsurprisingly-unsworn

---

[1]    In sharp contrast to Mr. Vanderpool's Charge, moreover, *nothing* in the Position Statement is stated under oath, or with any other indicia of truthfulness or reliability. To the contrary, Respondent's counsel purports to represent how various decisions were made and how various people were involved without providing support or substantiation for *anything*, much less an actual statement, sworn or otherwise, from anyone with actual first-hand knowledge.

ERIC M. NELSON
ATTORNEY AT LAW                                    2

assertions in Respondent's Position Statement that are the false and/or misleading ones here. Indeed, since each purported statement of fact in the Position Statement is not only unsworn, but repeated second (if not third) hand, Respondent's various claims as to what its various personnel, or even Mr. Vanderpool himself, purportedly said, didn't say, knew, didn't know, thought, didn't think, considered, didn't consider, did or refrained from doing is all utter hearsay. Indeed, it is often hearsay within hearsay. It is thus unreliable on that basis alone. Mr. Vanderpool's Charge, in contrast, was and is an entirely first-hand account reflecting actual personal knowledge, with *every single word* sworn to under penalty of perjury. *See* Declaration of Rafael Vanderpool, April 23, 2004 (the "Vanderpool Declaration" or "Vanderpool Decl.") (previously submitted), at p. 10. Indeed, <u>Mr. Vanderpool goes even further, swearing to the truth of every factual assertion in *this* rebuttal, as well.</u> *See* p. 10 below.

Before anything in Respondent's Position Statement is credited by the Commission, therefore, Mr. Vanderpool respectfully submits that Respondent should be required to re-submit it, with all of its purported factual assertions similarly sworn to by someone with first-hand knowledge. (It would, we respectfully submit, be a *very* different document.) Only in this fashion could the Commission fairly compare Mr. Vanderpool's submissions to Respondent's. And until then, the only conclusion which may reasonably be drawn from Respondent's Position Statement is that it utterly fails to say anything with any indicia of credibility or reliability.

## DISCUSSION

### I.    Introduction

At bottom, what happened here is simple. Respondent DSNY's Chief Information Officer ("CIO"), Edmund Lee, who is Asian, has for years manifested a bias against employees of color, particularly Hispanics and Blacks – a bias that was apparently shared by two of his subordinates, Deputy CIO Panos Mastrogiannis ("Mastrogiannis") and Director William Pepitone ("Pepitone"), both of whom are Caucasian.[2] That bias manifested itself, in Mr. Vanderpool's case, in the denial of promotions and a systematic and continuing shortfall in his compensation virtually from his first day in Respondent's employ. Over the years, that shortfall has become a substantial accrued amount, one which continues to grow.

The promotions Mr. Vanderpool was denied, and the lesser amounts that he has been paid by Respondent in each and every paycheck give rise to claims of discrimination on the basis not only of race and color, but national origin and ethnicity, as well. The reprisals he has suffered for complaining about the discrimination, moreover, have given rise to parallel claims of retaliation, as well. Nothing in Respondents' Position Statement materially undermines either claim.

In its Position Statement, Respondent makes essentially four arguments: (a) timeliness (*i.e.*, that Mr. Vanderpool's claims relate to matters occurring more than 300 days before he filed his

---

[2]    Because the bias originates with Lee, who sits at the top of Respondent's IT operations, neither of Mastrogiannis's or Pepitone's departures from Respondent's employ in 2022 changed Mr. Vanderpool's circumstances. Rather, the progress of his career remained (and continues to remain) stymied under and by Lee, and he (Mr. Vanderpool) continues to suffer – with each and every paycheck – a repeated and ever-increasing loss of earnings for no reason other than that he is not of a race, color, national origin or ethnicity which Mr. Lee apparently favors, to wit, either Asian or Caucasian.

ERIC M. NELSON
ATTORNEY AT LAW                                          3

Charge); (b) preclusion/collateral estoppel (*i.e.,* that Mr. Vanderpool's claims are barred because they have "already been determined" against him by the New York State Division of Human Rights (the "SDHR")); (c) comparability (*i.e.,* that Mr. Vanderpool's salary is, and has been, consistently lower because he is not a "manager," whereas those to whom he compares himself all are); and (d) seniority (*i.e.,* that Mr. Vanderpool's salary is also lower simply because he has been at his "level" for less time than any of his Asian or Caucasian peers). As the discussion below makes clear, however, each of these arguments is wrong as a matter of law, fact or both, and in several instances wholly a matter of smoke and mirrors due to its outright omission, conscious disregard, or deliberate misrepresentation of key facts. Rather than acknowledging the facts which underlie Mr. Vanderpool's claim, Respondent instead chooses in its Position Statement to deceive and mislead the Commission. Indeed, it does so in a fashion almost identical to how it previously (and successfully) misled the SDHR.

## II.    Respondent's Arguments All Fail

### A.    Mr. Vanderpool's Charge Is Timely

There are not merely one, but *two (2)* reasons why the timeliness argument in Respondent's Position Statement fails. First, the "continuing violation" doctrine captures not only the inferior pay Mr. Vanderpool received, and the promotions and advancements in "Level" that he was denied within 300 days of filing his Charge, but those which he received and was denied, respectively, for a substantial period of time prior thereto, as well. Second, the Lilly Ledbetter Fair Pay Act (the "LLFPA"), enacted by Congress in 2009 but made retroactive to 2007 makes each and every instance of Mr. Vanderpool's inferior pay – every paycheck he has received – a separate and independent claim of its own, and thus claims which, brought here, are not only timely, but which accrue, and renew, each and every pay period until the discriminatory shortfalls have been fully remedied.

Respondent asserts that

> several of plaintiff's claims are time barred. Indeed, all claims that accrued prior to June 28, 2023 (300 days prior to April 23, 2024, the day of filing the instant charge), are barred by the 300-day statute of limitation . . . .

PS at 3. The continuing violation doctrine, however, states that where a violation of the anti-discrimination laws has occurred within 300 days of the filing of a charge, prior acts which also do so, and form, with the more current violations, a continuing pattern of unlawful conduct, are also deemed timely. This principle is so well-established, in fact, that even the EEOC's own Form 5 – the form every charging party submits in support of their charge – has included, for *decades,* a box charging parties need merely to check (✔) in order to invoke it.

Mr. Vanderpool's case, moreover, isn't merely about the inferior pay he has received in the past, or within 300 days of the filing of his Charge. He has received inferior pay each and every time he has been paid *since,* a circumstance that, regrettably, continues to this day. It has, however, been a matter of settled federal law for at least fifteen (15) years – since Congress's enactment of the LLFPA – that where an individual employee is the victim of pay discrimination, that claim arises, *and renews,* with each and every paycheck the employee receives that reflects a discriminatory pay disparity. *See generally* Public Law 111-2, 123 Stat. 5; 42 U.S.C. §§ 1981a, 2000a, 2000d, 2000e, 2000e-16 & 2000e-5. In fact, the EEOC's own notice regarding the LLFPA expressly states:

ERIC M. NELSON
ATTORNEY AT LAW                                    4

> The [Lilly Ledbetter Fair Pay] Act restores the pre-*Ledbetter* position of the EEOC that
> *each paycheck that delivers discriminatory compensation is a wrong actionable under
> the federal EEO statutes, <u>regardless of when the discrimination began</u>.*

(Latter italics and underscore added.) *See* LLFPA, Pub. L. No. 111-2, 123 Stat. 5 (2009).

Respondent's assertion that Mr. Vanderpool's Charge here is somehow stale or untimely is therefore demonstrably false. And it is demonstrably false not merely on the basis of one, but rather two, settled aspects of current law.

### B.      There Has Been No Prior <u>Determination of Mr. Vanderpool's Charge</u>

Respondent also refers in its Position Statement to purported SDHR "findings" on Mr. Vanderpool's prior SDHR filing, and argues that they are "conclusive evidence" against his claims here. The Commission, it asserts, is thus precluded from considering and investigating them now. The only problem with this argument, however, is that <u>the SDHR never made findings – *any* findings – with respect to Respondent's prior complaint</u>.

In fact, the SDHR never even *opened* an investigation into any of Mr. Vanderpool's claims. Rather, it simply dismissed Mr. Vanderpool's complaint upon receiving a November 29, 2022 letter from Respondent's Director of its Office of Equity, Diversity, and Inclusion, Ryan David, without ever making *any* inquiry, or eliciting any evidence whatsoever. The SDHR's dismissal, in fact, just copied-and-pasted – *word-for-word* – from that letter, making clear that no serious evaluation had ever been undertaken with respect to Mr. Vanderpool's claims, but rather that Respondent's assertions had simply been accepted on their face, and without ever being even nominally probed or questioned.

The SDHR's dismissal occurred not only without any investigation, moreover, but with the SDHR flat-out ignoring the detailed evidence Mr. Vanderpool himself had provided in substantiation of his claims. Such evidence included the fact that the salary increases Mr. Vanderpool received had been those periodically required under the collective bargaining agreement ("CBA") governing his position, *and only those*; <u>not</u> the merit or performance-based raises he was routinely and repeatedly being denied as a Black Hispanic while, at the same time, his Caucasian and Asian coworkers were regularly receiving them. It also ignored the fact that his Caucasian and Asian peers and colleagues had been – and continue to this day to be – not merely consistently paid higher salaries, but have been initially hired at such higher salaries, as well; higher salaries even than he receives presently, with up to eighteen (18) years' greater seniority than they have.

Respondent notes that in May 2017, Mr. Vanderpool was promoted to Certified IT Administrator (LAN/WAN), Level I, and that, in November 2022, he received a "level change" to Certified IT Administrator (LAN/WAN) Level IV. Respondent does so to insinuate that these were "promotions," and that the compensation increases that came with them were merit and/or performance-based. In fact, however, the only *true* promotion Mr. Vanderpool ever received had been way back in 2012 – more than a decade ago – when his title was changed from Computer Associate Software Level I to Computer Specialist Software Level II. Even at that time, though, when the maximum pay rate for the Level II position was $94,602, Mr. Vanderpool was offered only $85,830 – almost $10,000 less. Despite being a permanent employee with six (6) years of service by that time, and having led critical projects

ERIC M. NELSON
ATTORNEY AT LAW                                          5

like Respondent's Notice of Violation Automated System ("NOVAS"), moreover, Mr. Vanderpool was only offered the Level II position, even though the Computer Specialist Software title he held included a Level IV position with a maximum salary (even at that time) of $117,791. In notable contrast, one of Mr. Vanderpool's Caucasian peers, Slawomir Lyzwa, was in fact appointed to that Level IV position *immediately upon his initial hiring* and received, at the time of his appointment, the even higher salary of $134,000.[3]

Even leaving all the non-promotion promotions with which Respondents seek to confuse the Commission aside, the second – and only other – non-CBA-related salary adjustment Mr. Vanderpool ever received came in 2018, and it was only granted after, and because, he had participated in a city-wide employee hiring pool and received a job offer from another New York City agency – the Department of Information Technology and Telecommunications ("DOITT") (now known as the Office of Technology and Innovation ("OTI")) – at the then-maximum rate for his civil service title. Rather than giving him an increase due to merit or performance, as Respondent misleadingly now tries to insinuate in its Position Statement, however, Respondent omits to disclose that it had given Mr. Vanderpool that increase merely to *match* DOITT's offer. Also omitted is its admission that it had only done so because Mr. Vanderpool had been a key participant in an important DSNY project at the time, and thus someone whom Respondent did not want to lose to DOITT.

The Certified IT Administrator (LAN/WAN) Level IV title change Mr. Vanderpool received in November 2022, moreover, was also not awarded on merit or performance. Indeed, it was not even initiated by Respondent at all. Rather, it came entirely as the result of a successful *grievance* Mr. Vanderpool had filed through his union due to the advanced duties, and increased responsibilities, he had regularly been performing since becoming (and notwithstanding being) merely a Certified IT Administrator (LAN/WAN), Level *I*. Put simply, having realized that Respondent would not voluntarily promote or change his title or Level, Mr. Vanderpool – with his union's assistance – succeeded in getting an arbitrator to *compel* Respondent to do so.

Simply stated, the *only* increases Mr. Vanderpool received after 2018 were those that had been union-negotiated for all employees (*i.e.,* those which had been collectively bargained for),[4] while his Caucasian and Asian coworkers received repeated merit, performance or other discretionary increases and promotions for the almost six (6) year period before he finally filed his Charge. In fact, the salary range for employees in Mr. Vanderpool's position, and at his level, is $124,282-$163,119. Notwithstanding Mr. Vanderpool's almost two decades of service, therefore, at $131,127 per annum, Respondent simply cannot deny that it is still, *to this day,* paying Mr. Vanderpool at close to the bottom of the permissible range.[5]

---

[3]       Mr. Lyzwa was also appointed to that Level, and given that much higher salary without even having taken the civil service examination required for permanent employee status.

[4]       Indeed, even Respondent itself admits that of the *twenty-two* (22) increases it now seeks to be given credit for providing to Mr. Vanderpool, all except the two (2) described above were "collective bargaining increases." *See* PS at 3.

[5]       Respondent's invocation of case law to support its preclusion argument also fails. This is because, of the four (4) cases Respondent cites, the first two involved attempts to re-*litigate* claims that had already been determined *in court. See, e.g.,* PS at 3 ("preclusive effects *in federal court*"; "in a subsequent

ERIC M. NELSON
ATTORNEY AT LAW                                    6

Of course, and as noted in subsection A above, moreover, the LLFPA also makes each and every paycheck subsequent to Mr. Vanderpool's original SDHR filing, or any purported determination thereof, a new violation. Respondent's preclusion argument therefore fails for yet an additional reason.

C.    **Respondent Also Cannot Avoid Liability By Pointing To Any Particular Civil Service Title, or Lack Thereof**

Mr. Vanderpool makes no claim in his Charge with respect to title. Rather, he compares himself in his Charge only to those at his level (Certified IT Administrator Level IV), noting that each and every one of his peers are both paid significantly more (many notably despite performing fewer or lesser duties than he routinely performs), and have been given greater opportunities for advancement than he has. This notwithstanding his much greater experience, demonstrated dedication, and uniformly excellent job evaluations. Whether they are called Computer Systems Managers by Respondents or not, Mr. Vanderpool has compared himself in his Charge only to those whose actual, substantive duties and responsibilities were/are the same, or are inferior, to his own. He is thus "comparing apples to apples," while (as explained further below), Respondent is not.

To demonstrate this, first, regarding compensation, even if those who hold manager titles are disregarded, at least four (4) of Mr. Vanderpool's Caucasian or Asian coworkers/peers/comparators, i.e., those precisely at the same level he is (to wit, Certified IT Administrator (LAN/WAN) Level IV) – Mr. Lyzwa (hired 2015), Hang Pang (hired 2014), Jimmy Cheung (hired 2017) and Hecker William (hired 2022) – have been, and continue to be, paid substantially more ($162,014, $163,119, $148,071 and $152,132, respectively) than Mr. Vanderpool ($131,127), even though each, and all, of them are substantially junior to Mr. Vanderpool (who was hired back in 2006). Indeed, even Respondent itself admits that the only person working on the "DevOps" team[6] who is paid less than Mr. Vanderpool is a coworker who was hired *sixteen (16) years after* Mr. Vanderpool was, i.e., in or about June 2022. *See* PS at 2-3 ("five months prior to Charging Party's appointment [to Certified IT Administrator (LAN/WAN) Level IV]").[7]

───────────────

*action*") whereas, of course, there has neither previously been, nor currently is, any court case here. And as to the latter two of the four cases, they don't bear upon the present circumstances in any way whatsoever. Instead, they merely assert a basic proposition not even at issue here, to wit, that a filing at the SDHR "preclude[s a complainant] from bringing a subsequent *action* on the same operative facts [under the state and city anti-discrimination laws, the NYSHRL and NYCHRL]," a principle known as the "election of remedies." *Id.*

6       Notably, Respondent also misrepresents Mr. Vanderpool's actual position and responsibilities. To be sure, he serves on its "DevOps" team, but he also is (and has at all relevant times herein been) a member of Respondent's "Server" team, a material fact Respondent conveniently omits to mention. This is no accident. Respondent disregards such a substantial and longstanding aspect of Mr. Vanderpool's responsibilities both to make him appear to be of lower standing/status and lesser duties at DSNY, as well as to try to avoid the fact that not merely his DevOps team colleagues, but also his colleagues on the Server team, are among his comparators.

7       Even this extremely junior coworker, moreover, received a Level IV appointment immediately upon being hired, whereas Mr. Vanderpool had had to repeatedly request it, grieve Respondent's

ERIC M. NELSON
ATTORNEY AT LAW                                    7

Second, regarding promotion, Respondent asserts that Mr. Vanderpool was not considered due to his failure to take a particular civil service exam. Respondent, however, promoted not merely one, but multiple individuals to supervisory or managerial roles without requiring any of them to pass such an exam, or hold a Computer Systems Manager ("CSM") or similar "managerial" title, These individuals include Joseph Morano and Mr. Pang.[8] Neither of them had either passed the subject exam, or held the managerial title Respondents now claim were (both) necessary in Mr. Vanderpool's case.[9] The reason is plain: neither so-called "qualification" truly had, or has, anything whatsoever to do with employee eligibility for promotion. Rather, those purported "qualifications" only serve as convenient pretexts for Respondent's, and particularly Lee's, true reason for denying Mr. Vanderpool a promotion: his race/color/ethnicity/national origin. Indeed, even when Mr. Vanderpool was offered an opportunity (notably by the only Hispanic Director in his department, Robin Perez) to take on a Lead role, Respondent still refused permit it.[10]

> **D.    Mr. Vanderpool Is No Less Senior or Long-Tenured In His
> Position Than Any of His Caucasian and Asian Peers Who
> Have Received, and Are Continuing to Receive, Higher Compensation**

Respondents also try to excuse their compensation discrimination against Mr. Vanderpool by claiming he lacks the seniority and/or tenure in his present (Level IV) position to be paid more. See, e.g., PS at 5 ("only 20 months"). In fact, however, the sole reason Mr. Vanderpool has been at Level IV for "only 20 months" is because Respondent itself has discriminatorily refused to promote him, keeping him at Level I until, as noted above, he brought and succeeded upon a grievance.[11] Indeed,

---

failure to grant it, and finally succeed in obtaining it only by going to arbitration after years and years of actual work. What, you may ask, was different about this very junior coworker as compared to Mr. Vanderpool that "qualified" the former for Level IV right from the start? He's Asian, and thus in one of Mr. Lee's preferred groups.

[8]    Mr. Morano, for example, holds only the title of "Certified IT Developer," but was promoted to Deputy Director of Desktop Services. Mr. Pang, a Certified IT Administrator (LAN/WAN) Level IV exactly like Mr. Vanderpool, was likewise promoted – to Deputy Director of Server/Application Support.

[9]    See also n. 3 (on page 5 above) for the additional example of Mr. Lyzwa.

[10]    Respondent cannot excuse its discriminatory treatment of Mr. Vanderpool on the basis of his supposedly "non-leadership" or "non-managerial" responsibilities, either. As just a few examples, Mr. Vanderpool participated in both the interviewing and hiring processes for several other members of his department (e.g., Chun Yang, Jose Santos). He has also served, and continues to serve, as his department's principal authority and expert for resolving complex LAN and WAN connectivity issues (affecting critical citywide applications such as SMART, EIS, DonateFood, NOVAS, MWBE, CFC and FWF); addressing connectivity issues with Kubernetes clusters; and resolving network problems with AWS (Amazon Web Services) and Azure servers. Finally, he has performed principal coordination functions for multiple complex projects within his department, including: (a) EIS, DVO, NOVAS, Shift Roster, MWBE and CFC project launches; (b) DSNY's MongoDB 5.X upgrade; and (c) Respondent's Sysdig Migration to Cloud.

[11]    From the time Mr. Vanderpool first received the title change to Certified IT Administrator (LAN/WAN), Respondent kept him at Level I while offering Level IV positions to numerous Caucasian and

ERIC M. NELSON
ATTORNEY AT LAW                                    8

Respondent undoubtedly would have kept him at Level I longer – perhaps forever – had he not done so. Respondent's assertion that Mr. Vanderpool was (and, notably, still is) being paid less because of his relatively short tenure at Level IV is thus like that of a child who first murders his parents and then claims to be an orphan. Mr. Vanderpool would have had well more than enough seniority at "Level IV" had Respondent itself not discriminatorily held him down. Put another way, Respondent shamelessly now tries in its Position Statement to justify its *compensation* discrimination against Mr. Vanderpool by using the *promotion* discrimination it has also engaged in against him.

**III.    Respondent's "Budget Constraints" Excuse for Denying Mr. Vanderpool Both Promotions and Proper, Higher Compensation Also Fails to Hold Water**

As noted in his Charge, when Mr. Vanderpool requested a promotion to Level II, he was told it "would not happen" due to alleged budgetary constraints. Somehow, though, Mr. Lee found sufficient "budget" to contemporaneously promote and give raises to several of Mr. Vanderpool's colleagues, including at least Sunny Shum (Asian), Mr. Morano (Caucasian), Daniel Starobin (Caucasian), Young Shin-Pin (Asian), Sreenivas Koonadi (Asian), Christine Lombardi (Caucasian) and Faisals Rehman (Asian).

Regarding Mr. Shum, for example, in May 2017, several members of Respondent's Server team passed the Certified IT LAN/WAN exam to become "permanent." At that time, Mr. Vanderpool was informed that only titles, but not annual compensation, would be changed, due to budget restrictions. He later learned, however, that Mr. Shum <u>had</u> received a salary increase at that time, from $105,047 to $118,000 – an increase of almost $13,000. He further learned that Mr. Shum had thereafter received a further increase of $10,068 (between 2018 and 2019); a further promotion and title change (to CSM); an even further increase of $9,931 (in 2020); and a yet additional increase of $12,845 in 2023, for a grand total of $45,797 in discretionarily increased compensation.

As for Mr. Vanderpool's other colleagues mentioned just above:

(i)    Mr. Morano received *three (3)* non-CBA-related compensation increases during the relevant period: (a) $5,000 in 2018; (b) a level increase to "Level IV" (Mr. Vanderpool's level) and an accompanying $3,875 increase in 2020; and (c) a $13,465 additional increase in 2023;

(ii)    Mr. Starobin also received three (3) non-CBA-related increases: (a) $13,086 in 2019; (b) $9,178 between 2020 and 2022; and (c) another $10,526 in 2023, for a total of almost $33,000 in increased compensation in just four (4) years;

(iii)    Mr. Shin-Pin received three (3) non-CBA-related increases, as well: (a) $11,050 between 2019 and 2020; (b) $7,362 between 2021 and 2022; and (c) $25,378 in 2023, for a total

---

Asian members of the Server team who had done no more than take and pass that particular exam at the same time as Mr. Vanderpool. Respondent did so, moreover, despite the fact that Mr. Vanderpool's responsibilities and duties were precisely the same as those of his fellow team members, *i.e.*, those of a "Level IV." Respondent's refusal to treat Mr. Vanderpool similarly to his Caucasian and Asian peers was so unbending and consistent, in fact, it took until October 2022, after the grievance arbitration, to achieve the change.

ERIC M. NELSON
ATTORNEY AT LAW                              9

of almost $44,000 in just four (4) years;

(iv)    Mr. Koonadi received one (1) non-CBA-related increase of $9,625 in 2022;

(v)     Ms. Lombardi received at least one (1) increase of $10,953 between 2021 and 2022; and

(vi)    Mr. Rehman received at least one (1) increase of $10,624 in 2023.

The difference between Mr. Vanderpool and all of these others?  Mr. Vanderpool is Hispanic, whereas all of the latter are in Mr. Lee's preferred groups – Caucasian or Asian.

**IV.    Mr. Vanderpool Also Wasn't the Only Hispanic/Black Who Was Subjected to Compensation Discrimination By Respondent**

Finally, and also notably, Respondent's compensation discrimination against Hispanics wasn't limited to just Mr. Vanderpool, as the following two examples make clear:

Mr. Perez, the sole Latino Director within Respondent's IT department, left Respondent's employ in May 2022 for reasons similar to those which prompted Mr. Vanderpool's present Charge. As a Director, he had managed both the Server and Network teams, yet some of his subordinates were still paid higher salaries than he was throughout the time he did so.  Mr. Perez repeatedly raised these concerns with Messrs. Lee and Mastrogiannis but, because their bias against Hispanics transcended just Mr. Vanderpool, Respondent never corrected or in any other way addressed the discrepancy for Mr. Perez, either.  Eventually, having grown tired of having his complaints fall upon deaf ears, Mr. Perez resigned from DSNY entirely.

Similarly, Jose Santos had been promised, by Deputy CIO Mastrogiannis, during his initial interview process, an eight percent (8%) salary increase upon the finalization of his hiring.  His hiring was finalized on or about November 1, 2021, but he not only did not receive the promised increase at that time, he hasn't received it at *any* time in the almost three (3) full years since, either.

Both Mr. Perez and Mr. Santos are available and willing to provide sworn statements, or testify, to confirm these facts, upon the Commission's request.

**CONCLUSION**

As Mr. Vanderpool's foregoing rebuttal, and previously-filed Charge clearly and plainly demonstrate, therefore, he has been, and continues to this date to be, discriminated against based upon his race, color, national origin and ethnicity, and retaliated against for his complaints about it.  Mr. Vanderpool accordingly respectfully submits that more than ample basis exists for the EEOC to find probable cause in this case, and requests that such a determination issue at the Commission's very earliest opportunity.

Mr. Vanderpool appreciates the Commission's careful and thorough consideration of his

ERIC M. NELSON
ATTORNEY AT LAW                                        10

Charge, and this rebuttal, and its continuing courtesies in this matter. If anything else is required either of Mr. Vanderpool or this office, kindly simply advise the undersigned.

Very truly yours,

Eric M. Nelson

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that all of the statements of fact in the foregoing rebuttal are true and correct.

Executed:        New York, New York
                 October 30, 2024

Rafael Vanderpool

# Exhibit E

Comparator & Raises Summary (condensed from plaintiff detailed research).

**Subject**: Rebuttal to the Respondent's Position Statement (EEOC Charge No. 520-2024-04665)

I am writing this letter to provide my formal rebuttal to the statement submitted by the New York City Department of Sanitation (DSNY) in response to my EEOC **complaint regarding salary discrimination based on race, color, and national origin.**

**Point-by-Point Rebuttal:**

**Disproving the SDHR Investigation:**

**SDHR's Lack of Thorough Investigation and Dismissal Based on Incomplete Evidence:**

I believe the New York State Division of Human Rights (SDHR) did not conduct a thorough investigation into my discrimination case against DSNY. My complaint was prematurely dismissed, relying heavily on a letter dated November 29, 2022, written by Ryan David, Director of the Office of Equity, Diversity, and Inclusion (OEDI), who responded on behalf of DSNY. By accepting this letter as conclusive without further inquiry, the SDHR failed to examine critical aspects of my case, including discrepancies in salary adjustments and denied promotions based on my race and ethnicity. Below is a detailed breakdown of how the SDHR's investigation was incomplete and overlooked vital evidence:

## Example 1: Number of Salary Increases

**DSNY's Position Statement:**

- "Mr. Vanderpool has received 14 salary increases and has been granted several promotions during his DSNY career.

**SDHR's Case Closure Document:**

- "Mr. Vanderpool has received 14 salary increases and has been granted several promotions during his DSNY career.

This statement is a direct copy-paste from DSNY's narrative and fails to evaluate the nature of those salary increases, the majority of which were union-driven rather than merit-based. Below is a detailed timeline of my salary increases that clearly disproves DSNY's claim that they granted several salaries increases. In fact, only one of these increases was initiated by DSNY.

| Date | Salary ($/year) | Notes |
|---|---|---|
| 9/10/2006 | $57,406.00 | Sanitation Hiring Salary |
| 2/1/2007 | $59,702.00 | Union-Contract raise not through Sanitation |
| 3/3/2008 | $62,090.00 | Union-Contract raise not through Sanitation |
| 3/3/2009 | $64,574.00 | Union-Contract raise not through Sanitation |
| 9/3/2011 | $65,220.00 | Union-Contract raise not through Sanitation |
| 3/25/2012 | $85,830.00 | Sanitation only salary increase: Title changed from Computer Associate Software to Computer Specialist Software Level 2. Initial salary increases was handled by Sanitation, with only the minimum starting salary of $85,830 offered. The Level 2 title's max salary at the time was $94,602. The Computer Specialist Software role also included a Level IV position with a maximum salary of $117,791, which I was never offered despite my qualifications and experience. |
| 9/3/2012 | $86,688.00 | Union-Contract raise not through Sanitation |
| 9/3/2013 | $87,555.00 | Union-Contract raise not through Sanitation |
| 9/3/2014 | $88,868.00 | Union-Contract raise not through Sanitation |
| 9/3/2015 | $91,090.00 | Union-Contract raise not through Sanitation |
| 9/3/2016 | $93,823.00 | Union-Contract raise not through Sanitation |
| 9/26/2017 | $95,699.00 | Union-Contract raise not through Sanitation |
| 6/17/2018 | $113,876.00 | In mid-2018, Sanitation matched a $112,000 offer from DOITT (now OTI), not by their initiative, but because I was essential to a critical project and involved in knowledge transfer at the time. |
| 9/26/2018 | $116,438.00 | Union-Contract raise not through Sanitation |
| 10/26/2019 | $119,931.00 | Union-Contract raise not through Sanitation |
| 5/26/2021 | $123,553.00 | Union-Contract raise not through Sanitation |
| 5/26/2022 | $127,284.00 | Union-Contract raise not through Sanitation |
| 5/26/2023 | $131,127.00 | Union-Contract raise not through Sanitation |
| 5/26/2024 | $135,085.00 | Union-Contract raise not through Sanitation |

**Example 2: Comparison of Salaries with Peers**

**DSNY's Position Statement**:

The SDHR found persuasive the facts that the employees who hold the same civil service title as Charging Party and earn higher base salaries than Charging Party, all work in different units, held different former titles, and served in the title longer than Complaint and all were appointed at different dates.

This statement is both deceiving and incorrect.

The SDHR's assertion that employees who earn more have served in the title longer than I have is factually incorrect. I have been employed by the New York City Department of Sanitation (DSNY) since 2006, yet many employees hired after me have been offered higher positions and salaries despite having less tenure.

For example, a former consultant, **Mr. Slawomir Lyzwa**, was hired on December 21, 2015, and was immediately offered the Certified IT LAN/WAN Level IV position with a maximum starting salary of $134,000 as a **provisional appointment. He had not taken any civil service exam at the time, which is required to become a permanent employee.** Despite this, he was not offered a Level I or Level II position with a minimum salary; instead, he was directly appointed to the highest level with the highest salary. **This underscores that even though he needed to pass the exam to attain permanent status, he was still hired at the highest level and salary, highlighting a disparity in how appointments are made.**

In contrast, despite being a permanent employee for six years at the time of my title change, I was only offered the Computer Specialist Software Level II position with a starting salary of $85,830, even though the maximum salary for this title was $94,602. The Computer Specialist Software role also includes a Level IV position with a maximum salary of $117,791, which I was not offered despite my qualifications and experience.

At that time, I was the technical lead for the Notice of Violation Automated System (NOVAS) project—a crucial system DSNY implemented in 2006. This system allows Sanitation Police Officers and Enforcement Agents to use handheld devices for issuing summonses. My responsibilities included supervising two technicians and managing the support and maintenance of the system's infrastructure, which covered servers across all five boroughs of New York City. I was also responsible for the upkeep of the handheld devices used by field officers and agents, as well as providing technical support to office staff.

Despite these significant responsibilities and my vital contributions to the department's operations, I was not offered a salary or position comparable to that of Mr. Lyzwa. This shows that tenure isn't the only factor determining salary and position level within the department, as individuals with less service time have been given higher positions and salaries than longer-serving employees like me.

| Employee | Hire Date | Hiring tittle | Title Change | Hiring Salary | Current Salary | Years of Service | Job Functions |
|---|---|---|---|---|---|---|---|
| Rafael Vanderpool (Me) | 9/10/2006 | Computer Associate software | Certified IT LAN/WAN Level 1, May 2017 | $57,406 | $139,501 | 18 | Devops and Server team |
| Karim Muhammad | 7/30/2007 | COMPUTER SYSTEMS MANAGER | Certified IT LAN/WAN Level 4 May 2017 | 113,568 | $156,579 | 17 | Sever Team |
| Bibin Qin | 10/5/2015 | COMPUTER SYSTEMS MANAGER | Certified IT LAN/WAN Level 4 Jun 2017 | $145,022 | $173,585 | 9 | Data Base Administration Team |
| Hang Pang | 10/27/2014 | Certified IT LAN/WAN Level IV | | $115,000 | $173,473 | 10 | Supervises Server Team |
| Slawomir Lyzwa | 12/21/2015 | Certified IT LAN/WAN Level IV | | $134,000 | $172,297 | 8 | Server Team |
| Imran Essani | 10/5/2015 | Certified IT LAN/WAN Level IV | | $108,000 | $147,867 | 9 | Desktop Engineering Team |
| Faisal Rehman | 1/30/2017 | Certified IT LAN/WAN Level IV | | $105,875 | $145,579 | 7 | Network Team |
| Jimmy Cheung | 3/6/2017 | Certified IT LAN/WAN Level IV | | $118,000 | $157,520 | 7 | Server Team |
| William Hecker | 5/2/2022 | Certified IT LAN/WAN Level IV | | $139,222 | $161,789 | 2 | Server Team |

DSNY Statement of Facts

**1)** Charging Party self-identifies as a Black Hispanic male, of Dominican (Republic) national origin. Charging Party was hired in the competitive civil service title of Computer Associate (Software) Level I, on September 11, 2006. On March 26, 2012, DSNY provisionally appointed Charging Party to the competitive civil service title of Computer Specialist (Software) Level II, with a salary increase. On May 16, 2017, DSNY promoted Charging Party to the competitive civil service titled of Certified IT Administrator (LAN/WAN), Level I, with a salary increase. On November 7, 2022, DSNY granted Charging Party a level change with salary increase to his current role, Certified IT Administrator (LAN/WAN), Level IV.

The DSNY's Statement of Facts contains inaccuracies that I would like to address and clarify.

## A. **Alleged Promotion on May 16, 2017**

- **DSNY's Statement:** "On May 16, 2017, DSNY promoted Charging Party to the competitive civil service title of Certified IT Administrator (LAN/WAN), Level I, with a salary increase."

- **Correction:** This was not a promotion in the traditional sense. In 2017, members of the Server Team—including myself, Slawomir Lyzwa, Hang Pang, Jimmy Cheung, Muhammad Karim, Sunny Shum, Masood Ahmed, as well as employees from other teams like Bibin Qin—took the civil service exam to become permanent employees under the title **Certified IT Administrator (LAN/WAN).**

  After passing the exam, we were informed by Edmund Lee, Chief Information Officer (CIO), and Panos Mastrogiannis, Deputy CIO, that our titles would be converted to Certified IT Administrator (LAN/WAN), However, due to alleged budget cuts, there would be no salary increases associated with this conversion.

  Regarding Mr. Shum, for example, in May 2017' several members of the Server team passed the Certified IT LAN/WAN exam to become "permanent." At that time, I was informed that only tittes, but not annual compensation. would be changed, due to budget restrictions. I later learned, however, that Mr. Shum had received a salary increase at that time from $105,047 to $118,000, an increase of almost $13,00. Thereafter another increase

of $10,068 (between 2018 and 2019) A further promotion and tittle change to CSM (Computer system Manager) an event further increases of $9,931 in 2020 and yet additional increase of $12,845 in 2023 for grand total of $45,797 in discretionarily increase compensation.

Despite this, all members were assigned **Level IV** positions, except for Masood Ahmed, who was given **Level II**, and myself, who was assigned **Level I**. This means that even though we all passed the same exam and were eligible for the same title and level, I was placed at the lowest level with the least salary increase, while others with less tenure were placed at higher levels.

Therefore, the characterization of this event as a promotion with a salary increase is misleading. While my title was changed, I did not receive a promotion in terms of level or compensation comparable to my colleagues. This is despite my successful completion of the exam and recognition as Employee of the Month.

## B. Alleged Level Change on November 7, 2022

- **DSNY's Statement:** "On November 7, 2022, DSNY granted Charging Party a level change with salary increase to his current role, Certified IT Administrator (LAN/WAN), Level IV."

- **Correction:** This statement is inaccurate. The title change to Certified IT Administrator (LAN/WAN), Level IV, on November 7, 2022, was not an initiative taken by DSNY. Instead, it was the result of a formal grievance I filed on October 14, 2022, due to the advanced duties and increased responsibilities I had been performing since being placed at Level I—a position I attained after successfully passing the civil service exam.

Upon reviewing my grievance, DSNY acknowledged that my responsibilities were commensurate with a Level IV position. However, contrary to their claim, this level change did **not** come with a salary increase. The adjustment was merely a title correction to reflect the duties I was already performing. The absence of a corresponding salary increase

highlights the ongoing disparity between my compensation and that of my colleagues who hold similar responsibilities but receive higher pay.

It's important to note that the level change was a corrective action prompted by my grievance, not a proactive promotion or adjustment initiated by DSNY. Therefore, the assertion that DSNY "granted" me a level change with a salary increase is misleading. The reality is that I sought formal redress to align my title with my actual job functions, and despite this alignment, I did not receive any additional compensation.

**Misrepresentation of My Role and Responsibilities**

**DSNY's Claim:**

"Charging Party works as Server Support for the DevOps team... does not manage any employees, and he reports directly to the manager of the DevOps team... Charging Party is the highest paid person on the team."

**Clarification:** DSNY's portrayal of my role significantly understates my responsibilities and is misleading. My duties align with those of a **Certified IT Administrator (LAN/WAN) Assignment Level IV**, not merely "Server Support for the DevOps team."

**My Actual Responsibilities:**
- **In-House Expert and Authority:**
  - Serve as the primary expert for resolving complex LAN "local area network"and WAN "Wide area Network" (computer networks) connectivity issues affecting DSNY's critical citywide applications, including SMART, EIS, DonateFood, NOVAS, MWBE, CFC, and FWF.
  - Address connectivity issues with Kubernetes clusters running critical applications.

o   Resolve LAN and WAN connectivity problems with AWS and Azure servers.

- **Coordination of Multiple Complex Projects:**
    o   **EIS Project Launch:** March 29, 2020
    o   **DVO Project Launch:** November 17, 2020
    o   **NOVAS Project Launch:** October 29, 2020
    o   **Shift Roster Project Launch:** August 13, 2020
    o   **MWBE Project Launch:** October 1, 2020
    o   **CFC Project Launch:** August 31, 2020
    o   **MongoDB 5.X Upgrade:** Completed June 12, 2022
    o   **Sysdig Migration to Cloud:** Led migration from on-premises to cloud, implementing Sysdig Secure and Monitoring in production environments

- **Supervisory and Leadership Roles:**
    o   Coordinate projects for the Server Team and act as a liaison between the Server Team and DevOps Team.
    o   Assume supervisory duties in the absence of my manager, support subordinates, provide oversight, and take responsibility for delegated assignments.

- **Additional Responsibilities:**
    o   **Security Vulnerability Management:** Address critical security vulnerabilities, managing incidents like NY22-0155, NYC22-0157, NY22-0135, and NYC22-0139.
    o   **Technical Support:** Provide support to both field officers and office staff, ensuring operational effectiveness.

**Conclusion:** DSNY's statement minimizes and misrepresents the true scope of my role and contributions. My responsibilities clearly match those outlined for a Certified IT Administrator (LAN/WAN) Assignment Level IV, involving high-level technical expertise, project coordination,

and supervisory duties. This misrepresentation adversely affects my professional standing and compensation.

## 2. Discrepancies in Hiring and Position Levels

**DSNY's Statement:**

"There are two others on the DevOps Team with the Charging Party, all of whom report to Michael Tsuji, and the Charging Party is the highest-paid person on the team. The other two team members self-identify as (i) Asian; and (ii) Hispanic and two or more races."

**Clarification and Response:**

**Involvement in Hiring Process:** I actively participated in the interview and hiring process for both team members mentioned, underscoring my seniority and leadership within the team.

**Chun Yang's Appointment:** Hiring date 06/13/2022

- **Position Level Discrepancy:** Chun Yang, who self-identifies as Asian, agreed to join our team at the same salary he earned at his previous job. Despite this lateral move in terms of salary, he was appointed as a **Certified IT Administrator (LAN/WAN) Level IV**

- **Comparison with My Appointment:** In contrast, when my title was changed, I was assigned **Level I**, the lowest level, despite having significantly more tenure and performing duties consistent with higher-level positions. This inconsistency highlights an unfair application of position levels within the department.

**Jose Santos's Unfulfilled Salary Increase:** Hiring date 11/01/2021

- **Promised Compensation:** During the interview process, Jose Santos, who self-identifies as Hispanic and two or more races, was promised an **8% salary increase** by Deputy CIO Panos Mastrogiannis upon being hired.

- **Lack of Follow-Through:** This promised salary increase was never realized. Jose Santos is willing to provide a statement confirming that this commitment was made and subsequently not honored.

- **Implications:** The unfulfilled promise to Jose Santos indicates inconsistencies in compensation practices and suggests that salary figures alone do not provide a complete picture of how team members are valued and compensated.

**Context on Compensation:**

DSNY's claim that I am the highest-paid person on the DevOps Team is misleading and fails to account for the disparities in position levels and responsibilities. Being the "highest-paid" does not mean I am compensated fairly for the duties I perform. New management has even acknowledged that all DevOps team members are underpaid, yet no corrective actions have been taken, citing budget constraints. This further highlights the inconsistencies and lack of fairness in DSNY's compensation practices.

**Position Level vs. Salary:**

Appointment to higher-level positions typically comes with recognition and opportunities for advancement. Despite my extensive experience and significant responsibilities, I was placed at a lower level compared to newer team members like Chun Yang, who was appointed to Level IV despite having less experience. Similarly, Jose Santos was promised an 8% salary increase during his hiring process, but this commitment was never fulfilled, making him another victim of DSNY's inconsistent compensation practices. These examples underscore the ongoing disparities in how positions and salaries are assigned within the department.

**Conclusion:** DSNY's statement lacks crucial details that reveal inconsistencies and disparities in how positions and salaries are assigned within the department. My involvement in hiring both team members demonstrates my leadership role, which is not accurately reflected in my assigned position level. Furthermore, the appointment of Chun Yang at Level IV with the same salary and the unfulfilled salary increase promised to Jose Santos highlight discrepancies in compensation practices. These factors collectively challenge the assertion that I am adequately compensated or that the team's composition negates claims of unfair treatment based on race or ethnicity.

**Misrepresentation of Salary Increases**

DSNY's claim that I received 22 pay increases is misleading. The vast majority of these raises—20 out of 22—were the result of union-negotiated collective bargaining agreements, unrelated to my performance or merit. In fact, only one increase was initiated by DSNY in recognition of my contributions, and even then, it was minimal.

DSNY's comparison of my salary to that of Mrs. Chun Yang, a newly hired employee with less seniority and responsibility, is inaccurate. Mrs. Yang's role does not carry the same level of responsibility as mine, making this comparison unfair and irrelevant to the inequitable treatment I have experienced.

Furthermore, DSNY overlooks how employees with less tenure, like Mr. Slawomir Lyzwa, have been placed in higher positions with substantially better pay. My title changes, described as "promotions," were often responses to counteroffers or grievances I had to file, not genuine recognition of my contributions.

## Conclusion

The issue is not the number of raises I've received, but the persistent inequity in compensation and recognition compared to others with less experience and responsibility. DSNY's narrative fails to acknowledge this core disparity.

**Summary of Salary Timeline:**

- Out of the 22 increases, 20 were union-driven, while only one was based on my promotion.
- My starting salary in 2006 was $57,406, and my current salary is $135,085, with most increases resulting from union contracts.
- The lone merit-based increase came in 2012, when I was promoted to Computer Specialist Software Level II. Even then, I was offered only the minimum starting salary, not the higher range my experience merited.
- In mid-2018, Sanitation matched a $112,000 offer from DOITT (now OTI), not by their initiative, but because I was essential to a critical project and involved in knowledge transfer at the time.

**Rebuttal to Respondent's Argument for Dismissal Due to SDHR Findings**

While Respondent argues that the current charge should be dismissed based on the New York State Division of Human Rights (SDHR) finding of "no probable cause," this assertion is both legally and factually flawed.

First, **the EEOC is not bound by the findings of the SDHR**. As stated in *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986), the U.S. Supreme Court has made it clear that Title VII gives the EEOC the authority to make an independent determination, even if a state agency, such as the SDHR, has already ruled on the issue. The EEOC conducts its own evaluation of the facts and circumstances of the case, applying federal law and standards. Therefore, the SDHR's findings do not automatically preclude the EEOC from examining the same claims.

Second, **the SDHR's investigation was incomplete**. As outlined in my rebuttal, the SDHR relied heavily on a response letter from DSNY without conducting a thorough review of key evidence or interviewing relevant witnesses. This lack of diligence renders the SDHR's conclusion unreliable

and insufficient to serve as a final determination on the merits of my case. In fact, several critical aspects of the discrimination I experienced were overlooked by the SDHR, and the full context was not considered.

**Rebuttal to DSNY's Assertion of Time-Barred Claims**

DSNY's claim that several of my allegations are time-barred is incorrect. Under the **Lilly Ledbetter Fair Pay Act of 2009**, each paycheck reflecting discriminatory pay resets the statute of limitations. Every pay period that I receive compensation based on discriminatory decisions constitutes a new violation, allowing me to challenge the ongoing pay disparity. Therefore, my claims remain timely.

Additionally, DSNY argues that the actions of former employees, Panos Mastrogiannis and William Pepitone, are irrelevant because they left the agency in 2022. However, **Edmund Lee**, the current CIO, was responsible for approving all major decisions made by these individuals. His continued oversight ensures that the discriminatory practices set in motion during their tenure persist today, making their actions highly relevant to my case.

Finally, DSNY's mention of leadership diversity does not negate the presence of systemic discrimination. The identity of a single leader does not address the broader pattern of unequal treatment that I have experienced.

My claims are timely under the **paycheck accrual rule**, and the actions of past employees remain relevant due to the continued oversight of Edmund Lee. DSNY's arguments fail to account for the ongoing nature of the discrimination I have faced.

**Relevance of Leadership Diversity**

DSNY's reference to the Deputy Commissioner of BIT, Michelle Coke, as a Black/African American individual, is irrelevant to the issues of systemic discrimination. The presence of a person of color in a leadership role does not preclude the existence of discriminatory practices within the department. My claims pertain to ongoing disparities in pay, promotions, and treatment that reflect a broader pattern of unequal treatment, regardless of individual leadership identities.

DSNY's assertion that my claims are time-barred is legally and factually incorrect. The **continuing violation doctrine** and the **paycheck accrual rule** both support the inclusion of all claims based on the ongoing discriminatory practices I have experienced. Furthermore, the roles of Panos Mastrogiannis and William Pepitone remain relevant, as their actions were conducted under the oversight of Edmund Lee, the current CIO, whose continued presence further validates the persistence of these discriminatory practices. Finally, DSNY's mention of leadership diversity does nothing to address the systemic inequities that are the basis of my complaint.

## Rebuttal to DSNY's Claims Regarding Comparator Employees and Promotional Exams

**DSNY's Claim**: "None of the alleged comparators are similarly situated to Charging Party…many of the alleged comparators hold higher civil service titles…and Charging Party has not taken the promotional exam for Computer Systems Manager."

**Rebuttal**: DSNY's argument that my comparators are not similarly situated relies on technical distinctions between titles and job functions to obscure the broader pattern of discriminatory

practices in promotions and compensation. Although some comparators hold different titles, the substance of their responsibilities, their promotions, and salary increases are directly comparable to mine. Furthermore, DSNY's selective application of budget constraints highlights the systemic inequity that affects employees like me, who were denied fair promotions and salary adjustments despite having qualifications and experience that match or exceed those of the comparators. I will address the key issues raised by DSNY.

**Civil Service Titles and Job Functions Are Not the Sole Determinants of Promotions and Pay Increases**

While DSNY claims that the comparators hold **higher civil service titles**, many of the individuals they mention have been promoted to **managerial roles without requiring them to take the Computer Systems Manager (CSM) exam** or even hold the CSM title. For example:

- Joseph Morano, who holds the title of Certified IT Developer, Level IV, was promoted to Deputy Director of Desktop Services, managing the desktop team. Yet I was never considered for any similar advancement despite my extensive experience, educational background, and tenure.

- Hang Pan, a Certified IT Administrator (LAN/WAN), Level IV, was promoted to Deputy Director of Server/Application Support, again without holding the CSM title.

This pattern shows that promotions within DSNY are not necessarily tied to passing the **CSM exam** or holding that title. This undermines DSNY's claim that my lack of advancement is due to my failure to take the **CSM exam**. The reality is that DSNY has selectively promoted individuals to managerial roles without requiring them to meet the standards they are now using to dismiss my claims.

**Misrepresentation of Budget Constraints and Salary Increases**

**DSNY's claim of budget constraints preventing salary Adjustments is demonstrably false.** Numerous colleagues received salary increases during the period when I was denied similar adjustments, despite multiple requests for promotion. I was told repeatedly that there was no budget available for salary increases, yet DSNY applied no such constraints to the following individuals:

- **Norville, Xandree (Caucasian)**
  **Hiring Title**: Computer Systems Manager
  **Hiring Salary**: $126,000
  **Pay Year**: 2016
  **Salary before leaving DSNY**: $144,991
  **Note**: In 2019, received a non-union salary increase from $129,780 to $140,768. Left the agency in 2023.

- **Macieszkiewicz, Monika J (Caucasian)**
  **Hiring Title**: Computer Systems Manager
  **Hiring Salary**: $125,000
  **Pay Year**: 2015
  **Current Salary**: $177,828
  **Note**: In 2019, received a non-union salary increase from $129,397 to $144,713. In 2021, received another non-union salary increase from $144,713 to $149,057, and in 2022, another from $149,057 to $152,761.

- **Rehman, Faisals (Asian or Pacific Islander)**
  **Hiring Title**: Certified IT LAN/WAN, Level IV
  **Hiring Salary**: $105,875
  **Pay Year**: 2017
  **Current Salary**: $145,579
  **Note**: In 2023, received a non-union salary increase from $113,778 to $124,402, followed by another increase within the same year from $124,402 to $136,842.

- **Christine T Lombardi (Caucasian)**
  **Hiring Title**: Computer Systems Manager
  **Hiring Salary**: $132,925
  **Pay Year**: 2018
  **Current Salary**: $171,462
  **Note**: In 2021, received a non-union salary increase from $132,925 to $136,913. In April 2022, received another non-union salary increase from $136,913 to $147,866.

- **Koonadi, Sreenivas (Asian or Pacific Islander)**
  **Hiring Title** : Certified IT Developer
  **Hiring Salary**: $135,584
  **Pay Year**: 2018
  **Current Salary**: $173,224
  **Note**: In 2022, received a non-union salary increase from $139,652 to $149,277. After the union contract, the current salary is $162,837.

- **Shih-Pin, Young (Asian)**
  **Hiring Title**: Computer Systems Manager
  **Hiring Salary**: $130,000
  **Pay Year**: 2017
  **Current Salary**: $190,728
  **Note**: In 2020, received a non-union salary increase from $135,584 to $146,634, another increase in 2022 from $146,634 to $153,966, and another increase in 2023 to $179,344.

- **Nayer, Irene (Caucasian)**
  **Hiring Title**: Computer Systems Manager
  **Hiring Salary**: $130,000
  **Pay Year**: 2016
  **Current Salary**: $172,024
  **Note**: In 2022, received a non-union salary increase from $143,841 to $148,156, and in 2023, from $148,156 to $161,756.

- **Starobin, Daniel (Caucasian)**
  **Hiring Title**: Computer Systems Manager
  **Hiring Salary**: $104,508
  **Pay Year**: 2015
  **Current Salary**: $183,687
  **Note**: In 2018, received a non-union salary increase from $108,204 to $124,000. In 2019, received another non-union increase from $124,000 to $137,086. Further non-union salary increases were applied between 2020 and 2022, from $137,086 to $150,377, with another increase in April 2023 to $160,903.

- **Morano, Joseph (Caucasian)**
  **Hiring Title**: Computer Systems Manager
  **Hiring Salary**: $120,000
  **Pay Year**: 2016
  **Current Salary**: $171,654

Joseph Morano was **temporarily promoted to Director** after only **five years** with the agency.

Despite my **18-year tenure** at DSNY and holding a **degree in Computer Science** and a **master's in information management systems**, I was never considered for such an opportunity.

- Salary **Increases**:

  - In **2018**, Joseph's salary increased from **$120,000** to **$125,000**.
  - In **2019**, his salary further increased to **$130,373**.
  - In **2020**, Joseph's salary rose again to **$134,248**, along with a **title change to Certified IT Developer Level IV**.
  - In **2023**, before the union contract, Joseph received another salary increase from **$134,248** to **$147,712**.

- Title **Change and Additional Increase**:

- In **January 2020**, Joseph received a **title change** to **Certified IT Developer Level IV**. Notably, he was **not offered Level III**, which would have matched his salary at the time of **$130,373**.
- With the title change to **Level IV**, his salary increased from **$130,373** to **$134,248**.

• Current **Role**: As a **Certified IT Developer Level IV**, Joseph Morano holds the position of **Deputy Director of Desktop Services**.

| Name | Hiring Tittle | Hiring Salary | Hiring Year | Current/Final Salary | Salary Increases Given by sanitation | Notes | Years of Service |
|---|---|---|---|---|---|---|---|
| Rafael Vanderpool (Me) | Computer Associate software | $57,406 | 2006 | $131,127 | 2012: $65,220 → $85,830.00 85830 | Sanitation only salary increase: Title changed from Computer Associate Software to Computer Specialist Software Level 2. Initial salary increases was handled by Sanitation, with only the minimum starting salary of $85,830 offered. The Level 2 title's max salary at the time was $94,602. The Computer Specialist Software role also included a Level IV position with a maximum salary of $117,791, which I was never offered despite my qualifications and experience. | 17 Years |
| Norville, Xandree | Computer Systems Manager | $126,000 | 2016 | $144,991 | 2019: $129,780 → $140,768 | Hiring Salary within maximum incumbent rate for CSM not the minimum incumbent rate. Received a non-union salary increase in 2019. Left DSNY in 2023. | 7 years |
| Macieszkiewicz, Monika J | Computer Systems Manager | $125,000 | 2015 | $157,997 | 2019: $129,397 → $144,713<br>2021: $144,713 → $149,057<br><br>2022: $149,057 → $152,761 | Hiring Salary within maximum incumbent rate for CSM not the minimum incumbent rate. Received non-union salary increases in 2019, 2021, and 2022. | 9 years |
| Rehman, Faisals | Certified IT LAN/WAN, Level IV | $105,875 | 2017 | $136,842 | 2023: $113,778 → $124,402<br>2023: $124,402 → $136,842 | Hired as Level IV from star date not a Level I. Received non-union salary increases in 2023. | 7 years |
| Christine T Lombardi | Computer Systems Manager | $132,925 | 2018 | $161,228 | 2021: $132,925 → $136,913<br>2022: $136,913 → $147,866 | Hiring Salary within maximum incumbent rate for CSM not the minimum incumbent rate. Received non-union salary increases in 2021 and 2022. | 6 years |
| Koonadi, Sreenivas | Certified IT Developer | $135,584 | 2018 | $162,837 | 2022: $139,652 → $149,277 | Hiring Salary within Level IV maximum Received non-union salary increase in 2022 before the union contract. | 6 years |
| Shih-Pin, Young | Computer Systems Manager | $130,000 | 2017 | $179,344 | 2020: $135,584 → $146,634<br>2022: $146,634 → $153,966<br>2023: $153,966 → $179,344 | Received non-union salary increases in 2020, 2022, and 2023. | 7 years |
| Nayer, Irene | Computer Systems Manager | $130,000 | 2016 | $161,756 | 2022: $143,841 → $148,156<br>2023: $148,156 → $161,756 | Received non-union salary increases in 2022 and 2023. | 8 years |
| Starobin, Daniel | Computer Systems Manager | $104,508 | 2015 | $160,903 | 2018: $108,204 → $124,000<br>2019: $124,000 → $137,086<br>2020-2022: $137,086 → $150,377<br>2023: $150,377 → $160,903 | Received non-union salary increases between 2018 and 2023. | 9 years |
| Morano, Joseph | Computer Systems Manager | $120,000 | 2016 | $161,409 | 2018: $120,000 → $125,000<br>2019: $125,000 → $130,373<br>2020: $130,373 → $134,248 (Title change to Certified IT Developer Level IV)<br>2023: $134,248 → $147,712 | Received non-union salary increases. In 2020, promoted to Deputy Director of Desktop Services, a managerial position, despite holding the title of Certified IT Developer, which is not a manager's title and without taking the required managerial exam. | 8 years |

## FW: Grievance response for Mr. Rafael Vanderpool

1 message

**Isma, Natasha** <NIsma@dc37.net>                                      Mon, Oct 31, 2022 at 1:12 PM
To: Rafael Vanderpool <r.vanderpool@gmail.com>

FYI

**From:** Hagevik, Dan (DSNY) <dhagevik@dsny.nyc.gov>
**Sent:** Monday, October 31, 2022 10:58 AM
**To:** Isma, Natasha <NIsma@DC37.NET>
**Subject:** Grievance response for Mr. Rafael Vanderpool

Good morning. My name is Dan Hagevik and I am the Director of Labor Relations at the Department of Sanitation. Recently an out of level grievance was filed on behalf of the employee referenced above. After speaking with management and conducting an investigation here is the official response.

Based on a review of the job specification, describing the scope and typical examples of the expected tasks to be performed, we agree that the tasks that Rafael has been carrying out are in line with level 4 responsibilities, and it is our position that we agree with the grievance and the remedy proposed to change the title from a Level 1 to Level 4.

Since Mr. Vanderpool has been making a salary in excess of the minimum incumbent rate for a Level 4 ($119,931 vs $113,736) for quite a number of years, and that this rate is in line with colleagues that are carrying out similar responsibilities, we do not believe that there is any financial compensation adjustment that is required to make the grievant whole.

We would be willing to consider reviewing Rafael's responsibilities within the DevOps team vis à vis his colleagues to understand if he is carrying out extra tasks or responsibilities comparatively speaking. If that was to be the case, we would look to petition to OMB for a merit increase to reward him for his continued efforts, however, would not look to do this as part of this grievance, and furthermore could not guarantee any amount or timing of this due to continued budget constraints the agency is faced with.

We will submit paperwork to HR that Rafael's level be changed from a 1 to 4 as a no-cost action to OMB, which should take approximately 2 weeks (barring any unforeseen HR rules and regs that have changed recently, or that we might not be aware of regarding title changes). Finally, some unions have language in their contracts that ensure a small increase in salary for cases like this(where the grievant is already making more than the minimum for the new higher level), I have been unable to find a copy of your unit contract on Cityshare or online. If per your contract he is entitled to this, please just send me the applicable language and I will make sure he receives it.

These individuals, among others, benefited from promotions and pay increases, all while DSNY denied me similar opportunities based on **alleged budget constraints**. This selective application of budget rules highlights systemic inequity in DSNY's compensation practices, which disproportionately affected me.

DSNY's argument that my claims are without merit because I have been in the Level IV position for only 20 months is irrelevant. The length of time in a role should not be the sole basis for salary and promotion comparisons, especially when DSNY has inconsistently applied promotions and salary increases to other employees, regardless of their tenure.

For example:

Joseph Morano, who holds the title Certified IT Developer, Level IV, was promoted to Deputy Director of Desktop Services without holding a CSM title, and his salary increased steadily over time, from $120,000 in 2018 to $147,712 in 2023.

Hang Pan, a Certified IT Administrator (LAN/WAN), Level IV, was promoted to Deputy Director of Server/Application Support, again without holding the CSM title.

# Exhibit F
## Back Pay Calculation Summary

| Year | max salary Level4 | Your Salary | Back Pay | Tittle |
|---|---|---|---|---|
| 2016 | 127,486 | 91,090 | 36,396 | computer specialist |
| 2017 | 141,740 | 93,823 | 47,917 | Certified IT Administrator |
| 2018 | 144,929 | 112,000 | 32,929 | Certified IT Administrator |
| 2019 | 149,277 | 116,438 | 32,839 | Certified IT Administrator |
| 2020 | $149,277.00 | $119,931.00 | $29,346.00 | Certified IT Administrator |
| 2021 | $153,755.00 | $119,931.00 | $33,824.00 | Certified IT Administrator |
| 2022 | $158,368.00 | $119,931.00 | $38,437.00 | Certified IT Administrator |
| 2023 | $163,119.00 | $131,127.00 | $31,992.00 | Certified IT Administrator |
| 2024 | $168,013.00 | $135,085.00 | $32,928.00 | Certified IT Administrator |
| Jan-may 2025 | $168,013.00 | $135,085.00 | $12,664.62 | Certified IT Administrator |
| jun- present 2025 | $173,473.00 | $139,501.00 | $2,613.23 | Certified IT Administrator |
| | | Total Back-Pay | $331,885.85 | |
| Attorney expenses | $30,000.00 | Total Amount | $361,885.85 | |

Formula used:

1. Biweekly Pay (You) = $135,085 ÷ 26 = $5,195.58

2. Biweekly Pay (Amended) = $168,013 ÷ 26 = $6,242.04

3. Difference per Pay Period = $6,242.04 - $5,195.58 = $1,046.46

4. Back Pay (Jan–May) = $1,046.46 × 10 = $12,664.62